## IN THE UNITED STATES DISTRICT COURT
### For The District of Columbia

_____
)
**HECTOR FRANCISCO BERMUDEZ**     )
**632 North Ripley Street**               )
**Alexandria, Virginia 22304**            )
)
**Plaintiff**                  )
)
**v.**                      )
)
**MEDSTAR GEORGETOWN**          )     **Case No._____**
**UNIVERSITY HOSPITAL,**           )
**Trading as MEDSTAR GEORGETOWN** )
**MEDICAL CENTER, INC.**           )
**c/o CT CORPORATION SYSTEM**     )
**1015 15th Street, NW, Suite 1000**   )
**Washington, DC 20005-2621**       )
)
**Defendant**                 )
_____)

## COMPLAINT

Plaintiff, Hector Bermudez ("Bermudez" or "Plaintiff"), by and through his undersigned

Counsel, files this Complaint against Defendant MedStar Georgetown University Hospital

("MGUH" or "Defendant") for violations of Title VII, 42 USC 20000e et seq.; 42 U.S.C. § 1981;

Age Discrimination in Employment Act ("ADEA") of 1967, 29 USC § 623 et seq., Americans

with Disabilities Act of 1990 as amended ("ADA"), 42 U.S.C. §§ 12101 et seq.; and DCHRA,

D.C. Code § 2-1401.01, et seq., and alleges as follows:

### NATURE OF ACTION

1.      This civil action, brought by Plaintiff Hector Bermudez, against MGUH is for unlawful,

intentional discrimination, harassment hostile treatment, retaliation, wrongful termination,

refusal to rehire him, and failure and refusal to accommodate him based on his disabilities, or

have interactive dialogue with him, in violation of federal and DC's anti-discrimination laws,

listed in above preceding paragraph, for which Plaintiff requests, declaratory judgment, and appropriate damages to make him whole.

2.    MGUH, through its agents, engages in intentional discriminatory practices of hiring young nurses, and surgical technicians, including those of Hispanic, Asian, Filipino race, ethnicity, or national origin, for a low wage. Then, after decades of their loyal, dedicated and exemplary service, and earning a higher pay rate, from gradual annual pay raises, and after getting old (over 40), MGUH through its agents, targets, intimidates, discriminates, harasses, and creates a hostile work environment for them. Then its agents, try to character assassinate such targeted employee, and notwithstanding the years of their devotion, loyalty, commitment, experience-backed great service such employee has rendered to the hospital and its patients over those years, MGUH will terminate such employee, and replace him/her with a younger, less experienced or skilled, and less paid nurses or technicians, that are outside the discharged employee's protected class. Hector Bermudez, is one of the victims of MGUH's unlawful discriminatory practice.

3.    MGUH's intentional discriminatory practices of disparate treatment, work place harassment/hostility, humiliation, intimidation, and retaliation, falls within the types of prohibited practices under Title VII, § 1981, ADEA, ADA, and the DCHRA anti-discrimination laws.

4.    MGUH's discriminatory practices of terminating surgical technicians, and nurses from certain race or ethnicity, sex, age, and national origin, or disability, and on those bases, violates their civil rights, and robs them of the privileges, benefits, and conditions of their employment, and causes them to suffer unwarranted pain and suffering, loss of income, and source of livelihood. And MGUH's discriminatory practices, and actions, has harmed Hector Bermudez,

because, as a result of his termination, he suffered loss of income, loss of confidence, loss of self-worth, deep anxiety, depression, loss of sleep, loss of appetite, significant weight loss, and suicidal thoughts, and preoccupation that led him to attempted suicide by himself.

5.     MGUH's discriminatory actions have also caused Plaintiff injury, because, as a result of its termination of his employment and loss of earning associated with it, he had to mitigate his loss and damages, by finding a new job. After a long search, he could only find a 24-hours part-time job offer, (which is less than the 36 hours he worked at MGUH), with no health insurance, and none of the benefits he received at MGUH, except 401k, resulting in him earning significantly less pay than he earned working at MGUH.

6.     The loss of his job and income, made him very angry, worsened his Post Traumatic Stress Disorder ("PTSD") symptoms, and as a result, he relapsed and started drinking heavily after being sober and free of alcohol for six (6) months. It also caused him to be despondent. He began having suicidal ideations that he has never had before, and became preoccupied by it. And then it got worse, when he attempted suicide, which caused him to be hospitalized for about a week, as a result.

7.     Plaintiff's termination, that caused him to lose his source of income, health insurance, ability to take care of his family, (as the main bread-winner), was devastating to him, and the anger, shame, humiliation, and the despair he felt because he no longer was able to take care of his family, became too much for him to bear, plus the fact that he suffers from PTSD.

8.     Plaintiff was a loyal, dedicated, efficient, and especial employee, who in accordance with MGUH's own policy, vigorously advocated for, and served the interests of every patient whose procedure he assisted the surgeons with, by insuring they have safe outcomes, and in general, the interests of MGUH itself, for 17 years. Yet, Defendant, intentionally, and discriminatorily fired

him, based on deliberate falsehoods, or distorted facts, bias, pretext and cover up for its discriminatory animus, based on his race or ethnicity, national origin, age, sex, and disability.

9.    MGUH is liable for its unlawful, intentional discriminatory policy, practice, and conducts in terminating Plaintiff who did nothing wrong, but was a devoted and committed professional whose intent and focus was on getting the job done properly and on time.

## INTRODUCTION

10.    This case is about a hospital, that talks the talk, but does not walk the walk. MGUH, talks about its "Spirit Values" - patient care, nurses, scrub technicians, advocating for their patients, team work, good work, and aspiration to being a "Role Model" i.e., an exemplary attribute or criteria that an employee nurse, or scrub technician like Plaintiff, could aspire to. Yet, when Plaintiff, in applying those values, demanded that certain coworkers do their job, or do them properly or on time as needed, because he has already been targeted for termination, OR director, Smith, and his direct supervisor, Geide, connived, against him, and falsely turned the facts against him, even though he did nothing wrong. Following the same pattern, whereby Smith, with animus, terminated other employees (for example Liberty Hilado), not because they are not qualified or, do not do their job well, but because of normal and usual employees word spats, (which happens in every workplace), based on their race, national origin, age, sex, etc.

11.    It is a case about defendant's failure to rehire Plaintiff. After MGUH fired Plaintiff, his job position remained open, it openly kept seeking candidates with his qualification to fill his position. Plaintiff applied to be rehired through a recruiting platform, and through MGUH's own recruiter, who saw that Plaintiff has the qualification and experience that MGUH was looking for. The recruiter was interested in hiring Plaintiff, but MGUH refused and stopped the recruiter

from doing so. Plaintiff's former job position still remains open, and it keeps seeking candidates with Plaintiff's qualification.

12.    This case is also about MGUH's failure to accommodate, and refusal to engage in interactive dialogue for his disability accommodation, following his request to leave before the end of his scheduled duty, due to the PTSD symptoms that he suffers, that was triggered by recent disturbing, stressful, information he received, that his daughter was self-mutilating, by cutting her wrist. Though Plaintiff was given permission to leave the hospital and go home, by the charge nurse, he actually was not accommodated, because, instead, he was maligned, treated in a hostile manner, written up, suspended, and ultimately fired, even though MGUH, and its agents, including his direct supervisor Matt Geide ("Geide"), knew that he suffered from PTSD. Still, MGUH and its agents terminated Plaintiff, in violation of the ADA, and DCHRA.

13.    Plaintiff received no support or accommodation. Instead, MGUH looked for a way to terminate him. First, they unnecessarily concocted a pretextual need for, and subjected him to an evaluation for fitness to perform his duties, that was not warranted in the circumstances, but based on Geide, and Operating Room ("OR") director, Christina Smith's ("Smith") own discriminatory animus, and not based on any objective facts.  Even then, after Plaintiff went through the assessment, and the hospital's own occupational health department assessed him as fit for duty, and to return to work, MGUH and its agents, dragged their feet and delayed his return to work, because they were working on a pretext and cover up reason to fire him.

14.    Also, as in other cases brought against MGUH, like Liberty Hilado's, without any, or thorough investigation, MGUH, through its agents, ignored the true facts concerning Plaintiff's interactions with certain coworkers, and intentionally, recklessly and discriminatorily terminated him on the strength of their animus-born, made-up facts, because a pre-intent-decision to fire

him, had already been reached, and so, any accusation against him, no matter how it lacks objective, logical sense, or how false or irrelevant it is, in the circumstances, it was enough for Smith and other senior officials, who sanction it, to peg a termination on, which is what they did to Plaintiff in this case.

15.     MGUH, has a culture that centers on position, power, and personality, where management personnel, protects themselves, by covering for one another's - directors, managers and supervisors' misdeeds, and wrongful actions taken against their subordinates, like Bermudez, or by intentionally turning a blind eye. Unfair, unlawful and intentional discriminatory adverse actions taken against an employee like Plaintiff, were never taken seriously or fairly and properly investigated or resolved. Factual truth was suppressed, or outright falsified, or distorted. Their skilled, experienced, reliable and dependable, loyal, committed, and hard-working subordinate OR technical scrub like Bermudez, were constantly thrown "under the bus" whenever it suits GMUH, and its agents' whim and caprices. To help their bottom line, they replace the fired employee with younger, less experienced nurses, or scrub technicians, who they pay a fraction of what they paid their terminated, older, but experienced, nurses or scrub technician, as in the present case, on a pretext, and cover up, in violation of federal, and DC anti- discrimination laws.

## JURISDICTION AND VENUE

16.     This Court has Jurisdiction pursuant to 28 U.S. C. §1332 The Court also has Supplemental Jurisdiction under 28 U.S. Code § 1367.

17.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, as Defendant resides and does business in the District of Columbia ("District" or "DC"), and the events, actions or omissions giving rise to the claims occurred in the District.

## PARTIES

**Plaintiff:**

18.    Hector Bermudez, is a citizen of the State of Virginia, and a resident who is domiciled in Alexandria, Virginia. He was employed by MGUH in the District of Columbia.

**Defendant:**

19.    MGUH, is a for-profit business, who does business in the District of Columbia, and whose office is located at 3800 Reservoir Road NW, Washington, DC, 20007.

## ADMINISTRATIVE PROCEDURES

20.    This action is timely. Plaintiff exhausted all Administrative Remedies, before bringing this action. He filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), charge No. 570-2025-01035. The EEOC issued notice of right to sue on 02/27/2025, See **Exhibit A.**

## FACTS

**Plaintiff's Educational Background**

21.    Bermudez, graduated from the Surgical Technologist School, Naval, School of Health Sciences, Sandiego, California in July, 2003. And Meridian Institute of Surgical Assisting, in July 2015. He is licensed as a Surgical Assistant, by the District of Columbia's Department of Health ("DCDOH"). He is fluent in, and has full proficiency, in both English and Spanish languages. And he has Seventeen (17) plus years of practical experience in Neuro, Spine, and General Surgery.

**Plaintiff's Military Background**

22.    Bermudez is a Veteran of the Gulf War Era. He served in the Navy from December 17, 2001 to December 16, 2006; from May 15, 2009 to January 30, 2010; from May 21, 2010 to May 21, 2011; and later, to Afghanistan from 2011-2012.

23.     On December 2, 2022, the Department of Veterans Affairs ("VA") evaluated and rated Bermudez as 30% disabled due to military service-connected PTSD, with alcohol use disorder. On April 15, 2024, after his termination, the VA reassessed and up-graded Plaintiff's military service-connected PTSD with alcohol use disorder, disability to 50%. And after he was fired by Defendant, he attempted suicide, and was hospitalized, on October 2, 2024, the VA, reassessed Bermudez and again, upgraded his disability to 70%. So, as a veteran, he is now, 70% disabled.

**Beginning of Plaintiff's Employment at MGUH and Historical Facts**

24.     Bermudez, started working at MGUH in early January, 2007. He had just finished his contract with the Navy from now known as, Walter Reed Bethesda hospital. When he was hired, MGUH expressly promised to pay him $36 an hour in a letter it sent him by mail. However, after a few weeks, Bermudez noticed that his paychecks were not reflecting the promised pay amount, but was only about $18 per hour. So, Bermudez contested the short-payment, and after, he was browbeaten by MGUH's management to agree to a reduced pay of $20 an hour - $16 dollars per hour, less than the contractual pay amount he was promised when he was hired.

25.     After a few years, and still in the Navy reserves, Bermudez volunteered to deploy to Iraq in 2010 to 2011 and then to Afghanistan from 2011-2012. After the 2-year break, Bermudez returned to work at MGUH. He then noticed that his hourly pay did not really change from the time he deployed till his return. He was getting paid about the same pay as someone in his field who just graduated from a surgical technician program, instead as someone with his 10 years plus, practical skill and experience. He was getting paid around $26 an hour. Bermudez complained about that short-changing unfairness, to his then OR director, who later quit for some reason.

26.    After a couple of interim directors came and went, around 2018 Plaintiff had Vicky

Runyon ("Runyon") as his interim OR director. Runyon on her own, noticed the discrepancies in

Bermudez' pay, and did something about it. After that, MGUH came to an agreement with

Runyon to give Plaintiff about $10,000. MGUH gave Plaintiff two separate checks totaling close

to $10,000.00. However, Bermudez told Mrs. Runyon that it still wasn't enough, so, MGUH also

decided to give Bermudez a significant pay raise that was about $8 per hour.

**Events, and Actions MGUH Took in Response, Against Bermudez, And the Reason It Gave
for Terminating His Employment with It**

27.    After working for Defendant for 17 years, on 04/30/2024, it intentionally and

discriminatorily terminated Bermudez' employment, based on his race or ethnicity, national

origin, sex, age, disability, and retaliation, for seeking accommodation for his PTSD – asking to

leave, and after leaving work because of the PTSD symptoms he was having, for complaining

about not being paid, after MGUH failed to pay him, and for discriminatory hostility for delaying

his wage payment for another three (3) days after Bermudez complained about not being paid on

time, like other employees were, during that pay period.

28.    Throughout his over 17 years tenure working for MGUH, it has always paid Bermudez,

and he has always received his pay on time, The late payment and further delay of his pay when

he complained about it, while on suspension, was the first time MGUH has paid him late.

Although Smith and the Payroll office apologized, they gave no reason to Bermudez, for

delaying his pay, when other employees got paid on time, during the same pay period.

29.    On 04/01/2024, Bermudez received a phone call from Smith, and was informed that he

has been put on paid suspension till further notice. On April 26, 2024, Bermudez did not receive

a paycheck, as he was supposed to, so, he emailed Smith, and the payroll office, complaining that

he has not been paid. They apologized, but paid him three days later, on 04/29/2024.

30.    The next day, on 04/30/2024, Bermudez received a phone call from Smith and Ellen Bushmiller ("Bushmiller"), as a witness, and was told that he has been terminated for inappropriate behavior and comments. Bermudez believes that the "inappropriate behavior and comments" reason given by MGUH, for firing him, was a pretext and cover up of the actual motivating, discriminatory and retaliatory reasons for firing him.

31.    During his over 17 years tenure working for MGUH, Bermudez had no disciplinary record until his workplace work-related word exchanges with his coworkers, and him asking for accommodation due to his PTSD symptoms that he was experiencing. Those events occurred, on6/21/2023; 10/26/2023; and 3/28/2024, respectively.

32.    Bermudez did the following on those dates: 6/21/2023 – Bermudez, due to PTSD-triggered irritability, in an outburst, tells a coworker, suite attendant (aka cleaning staff), who failed to do her work, i.e., bring in a fresh bed for the next surgery, after Bermudez had asked her three times, before, to "please do your fucking job"; 10/26/2023 – Bermudez having PTSD symptoms of heightened anxiety that was triggered by knowledge of, and consuming thought about her teenage daughter self-mutilating by cutting her wrist, asked to be excused to leave, and did leave work; and 3/28/2024 – Bermudez, again, due to PTSD-triggered, anxiety and stress, (because the next surgery was soon to begin, and the microscope must be fully draped, to protect the patient, and the fact that the surgeons will soon ask for it), sarcastically, asked Ashley Clark, a surgical tech, who refused to fully drape the microscope that was to be used for the next surgery, "is that  how we do things now?"

33.    Bermudez has over a decade's history of suffering from military service-connected Post Traumatic Stress Disorder. MGUH, its management, including Bermudez' direct supervisor Matt

Geide, knew this fact. Geide, in the past, has also permitted Bermudez to go home, when being overworked, triggered his PTSD symptoms.

34.    Prior to the above dates and events, throughout his tenure working for MGUH, Bermudez has not been disciplined with written warnings, or suspension, and he has not been referred for fitness for duty evaluation, even though he had been suffering with PTSD, for over a decade, while working for MGUH.

35.    However, for the stated events in above, MGUH gave Bermudez a written warning twice; suspended him twice; referred him to its Occupational Health Department ("OCHD") for fitness for duty; and ultimately fired him, all within nine (9) months, and clearly when he was suffering from the effects of a serious disability- PTSD, (which MGUH was aware of), and needed to be excused, or accommodated.

36.    For almost two decades – over 17 years working for MGUH, Bermudez has been a dedicated, loyal, and competent performer of his duties as a surgical technician. He takes his duties very seriously, and expected same from his coworkers.

37.    During his tenure, he never received a poor performance evaluation. MGUH has three (3) levels of performance ratings. The first and highest is "Role Model"; the second and higher rating, is "Key Contributor; and the third and lowest rating is "Below Expectations." Bermudez has always been rated by MGUH, as a Key Contributor, and he has never been rated as Below Expectations.

38.    Also, MGUH never claimed that it terminated Bermudez, because he was not qualified, experienced, or did not perform his job well, when they it terminated him.

**A Write Up Bermudez Contested Prior to 10/26/2023**

39.     On or about 6/21/2023, Bermudez got into a work-related discussion with a coworker – a "Suite Attendant" (aka cleaning staff). On that day, Bermudez and his OR team had finished their first surgery, and were behind schedule for the next surgery. When the suite attendant came into the OR, Bermudez told her, "I had done all the cleaning and all that we needed was a fresh bed." After asking her three (3) times, for a fresh clean bed, and still, none was brought in, thus delaying things further, Bermudez, feeling anxious because they were running late, frustratingly said to her, "I just want you to do your job, could you please do your fucking job."

40.     The next day, regretting his use of the "F" word, Bermudez went and self-reported the incident, to his managers, Geide, and Bushmiller, and told them what happened the day before. He told them that his outburst was a result of his frustration that they were behind schedule, and emotional and mental issues that he has been struggling with, and that he is being treated for military service-connected PTSD, and anger management issues, which a therapist has been helping him deal with. He also told them Geide knows that he has PTSD, because in the past, he had informed Geide, when work was affecting him because he was being overworked in the Neuro service, and that he needed a break because of his PTSD.

41.     In the past, Geide had granted Plaintiff time off, because of his PTSD, prior to the 06/21/2023 incident. At the end of their meeting, Geide and Bushmiller gave Bermudez a card with 1-800 phone number that he could call for mental services that MGUH provides. He thanked them, but did not call that number, because at the time, he already had a therapist who was helping him.

42.     After that incident, Plaintiff went on a scheduled vacation and returned on 08/15/2023. On his return, he was given a warning for the first time, that MGUH termed "Final written warning" for the incident with the suite attendant, i.e., telling her, "could you please do your

fuckin job" or, for using the "F word" on 06/21/2023 (almost two months later), despite him self-reporting himself, explaining his frame of mind, given the pressure he was dealing with, as they were late on schedule and expressing regret.

43.    When Bermudez was given that "final written warning" (for the first time), he was confused by it being labeled "final" and he questioned that in his email correspondence with Defendant's official. Bermudez wanted also to contest it, and attempted to do so, but nothing happened from MGUH's part, and it never resolved that matter, before firing him, and so, he lost the opportunity to fully contest that warning.

44.    Bermudez wanted to contest that "final written warning", and told MGUH so. He asked for the form to contest it. But was told by MGUH, that the 14-days window for contesting it has passed. But the time for him to contest the "final written warning" passed, because though Defendant handed the warning to Bermudez on or about 08/16/2023, (almost 2 months after the incident), the warning was actually issued on 06/21/2023, the date of the incident, which is more than 14 days that MGUH's policy gives an employee like Bermudez to contest an action. It was not Bermudez' fault that the 14-days window elapsed. The warning was not given to him before he left for his vacation, and it was practically impossible for him to contest a warning within 14 days, when he never was aware of it, until he returned from his vacation on 8/15/2023.

45.    MGUH deliberately issued their "final written warning" to Bermudez, and failed to give it to him, until after the 14 days window elapsed, while he was on vacation, so he won't be able to contest it. That matter remained unresolved up to the time he was fired, and so, Bermudez lost the opportunity and ability to fully contest it. Even as it lingered without any resolution, MGUH, one-sidedly used it against him.

46.    To Bermudez' knowledge, no disciplinary action was taken against the female suite attendant who failed to do part of her job that MGUH paid her for – i.e., bringing in a fresh clean bed into the OR, promptly after the previous surgery, and before the surgeon(s) and the patient arrives for his/her scheduled next surgery.

**MGUH's Biased and Confusing Progressive Disciplinary Policy Misnomer of Naming Written Warnings or Write-Ups As "Final" and "Notice of Corrective Action"**

47.    MGUH seems to have a progressive disciplinary policy or procedure, that is deliberately intended to confuse employees than to inform them. One that is skewered to serve it, and its management's ends, but not to guide its employees, because, it calls every warning a "final" warning whether it was the first, second, third time, etc., that such warning is being given to an employee, which makes no logical sense, and renders the word "final" useless and meaningless.

48.    MGUH and its agents, use the word "final", to help them, whenever they want to target an employee they want terminated, because, the word "final" helps them create the illusion of series of previous wrongful conducts by an employee, even if that "final" warning to such employee, was given to that employee, for the first time, and perhaps, for simply asking a coworker to do her job, albeit, in colorful words, that came out of frustration and mental stress.

49.    MGUH's actions were so one-sidedly unfair. It amounts to disparate treatment, because it robs Bermudez of the benefits and privileges of his employment, and created a hostile work environment for Bermudez, because he felt cornered and intimidated by MGUH's actions, which also induced fear in him, because he felt he no longer could freely discuss or express his point of view, about work-related matters, without being unnecessarily punished by Smith.

50.    To-date, Bermudez has not received any proper explanation for MGUH's use of the word "final" for every warning, write up, or notice of corrective action, that it gives to employees it is about to fire. MGUH has not pointed to any written policy, that explains its use of the word final,

that as used, specifically, is clearly, biased against Bermudez, does nothing but confuse him, as the word "final warning" was used against him in this case, for the first time.

51.    MGUH's other misnomer, is its use of "corrective" as in its use of the word, "Notice of Corrective Action." MGUH uses this red herring, head scratching, and confusing label, for actual termination that it gives its employees, including Bermudez. MGUH calls its the termination letters "Notice of Corrective Action."

52.    MGUH titles termination letters as "Notice of Corrective Action" even though it knows, and fully understands, that firing an employee is not in fact, a corrective action. Yet, it uses it deceptively, and confusingly, to create the illusion that it provides its employees real opportunity to self-correct, before firing them, when the opposite is the case.

53.    MGUH has no true or real corrective action procedure or process whereby it identifies, and addresses the root cause of an employee's non-conformance behavior, or performance, with the goal of preventing the issue from recurring, because, its modus operandi, is never remedial.

54.    Also, MGUH does not have a true or real progressive disciplinary procedure or process, because, its discriminatory practice of pre-determining and targeting an employee for termination like it did in Hilado's case, and now Bermudez', based on their protected class, for any flimsy, pretext reason, or one that objectively, does not warrant firing an employee like Bermudez for, is antithetical to, and mutually incompatible with the concept of giving an employee a real chance to self-correct, and prevent a recurrence of their non-conforming behavior or performance.

**What Actually Happened in OR 11, on 10/26/2023 And MGUH's Resultant Intentional Discriminatory and Retaliatory Actions Against Bermudez**

55.    The sum of what Bermudez did on 10/26/2023, is that in an attempt to control his PTSD symptoms, and to prevent distracting the OR team's focus on the next surgery, Bermudez decided to leave work, because, he felt he was about to have an emotional and mental

breakdown, given the pre-occupying anxiety he was having, due to his discovering that his teenage daughter, was self-mutilating, by cutting her wrist. He discovered this fact, a day prior, on 10/25/2023. The consuming thought of that fact, plus work-related stress, seriously affected him, and he knew it will also distract his. So, he asked to be accommodated – be allowed to leave in the middle of his scheduled shift for that day. He then spoke to the charge nurse at the time, Raj Mesepaum ("Raj"), and asked his permission to leave, because he was not feeling well, and Raj, permitted him to leave. Then, he went to the lounge, retrieved his lunch, hugged Rita, his coworker, and left the building. For that, he was maligned, written up, suspended, and referred to OCHD for unnecessary fitness for duty test.

56.     On 10/26/2023, on top of his work-related stress, Bermudez was experiencing a high level of concern and anxiety about her daughter's wellbeing - a troubling personal family matter that he would have liked to keep private, but for the fact that HR and the hospital's OCHD obligated him to disclose it. As he felt his PTSD symptoms being triggered, he feared it will impact his focus and he did not want that to happen while a patient's is in surgery.

57.     Bermudez' discovery about her daughter a day prior, triggered his PTSD symptoms. With that knowledge and worry on his mind, on the morning of 10/26/2023, plus his reasonable anxiety, about the next, very complex surgery, which he and his OR team, with Dr. Voyadzis were to perform in OR 11, - a new surgery procedure that Dr. Voyadzis has recently been performing, and which Bermudez have only done once before, with him, and as a PTSD suffer, his anxiety level rose.

58.     When he first worked with the doctor, on the procedure, Bermudez needed, and asked for extra help - a second scrub technician, because there was a short operating window time to complete the surgery, and with only a spinal epidural anesthesia, the patient would be awake.

59.     The new procedure takes about 2-3 hours, but when done under general anesthesia, it takes about 4-6 hours, so, time was of the essence, to complete it before the anesthesia wears off. But on 10/26/2023, Bermudez had no additional support during that surgery and the only help Dr. Voyadzis had, was from a Physician Assistant ("PA") who had no knowledge of the case, or how to assist him, so Bermudez also had to provide the PA with guidance on what to do during the case. In addition, there was also the issue of OR 11, which is a very small room to do the complex spine surgery, with all the extra equipment needed for the procedure.

60.     After completing the first case, which started at 8 a.m., and finished around 11 a.m., our next case to follow was a two-operating-surgeon case - Dr. Voyadzis, and Dr. Margolis. Dr. Margolis, was to help with the approach of getting to the spine through the abdomen. That procedure, was a high-tense surgery that requires a focused state of mind, to achieve a successful outcome.

61.     There is a record at MGUH, of multiple patient fatalities during surgery and after surgery with this procedure. Bermudez was in the OR when one of this procedure was performed years ago on a patient, and that patient died in the recovery floor, not long after that surgery.

62.     Around 11:00 a.m. after the first case was completed, Bermudez's lunch break relief called into the room, and Lynn Mcarthy ("Mcarthy"), a nurse who was helping clean the room, answered the phone. At the time, Bermudez was dropping off his cart, and when he returned to the room, Mcarthy told him that his break relief, traveling scrub technician, said that Bermudez should leave for his lunch, that she would be in the OR in 5 minutes. Bermudez did not leave, but stayed in the OR, waiting for his relief to come in so that he could do a proper handover to her. But his relief, did not show up until 11:25 a.m., (25 minutes later). When his relief came in, because she was late, and Bermudez and his OR team, were running late to get ready for the next

surgery, Bermudez told his surgical tech relief, that it was no longer a good time for him to take his lunch break. His relief then said OK, and left OR 11. Bermudez does not remember the traveling scrub technician's name, because she was a contractor, and not a regular MGUH staff.

63.    By the time his relief left OR 11, Bermudez and his OR team were running late and her lateness did not help timewise. So, coupled with what was on Bermudez's mind concerning his teenage daughter, his anxiety level went seriously high, and as someone who suffers from PTSD, he knew that his high level of anxiety and stress, will affect his focus during the next surgery. He did not want that, and trying to avoid that, so he asked to be excused for the rest of his shift.

64.    Bermudez went to his direct supervisor Geide's office to explain to him and ask permission to leave, but Geide was not in his office. He went to Bushmiller's office, but she too was not in. With no success, he then went to Smith's office, and she too, was not in her office.

65.    Not finding Geide, Bushmiller, or Smith, Bermudez, went to the charge nurse, Raj, told him that he was having an emotional and mental crisis and needed to leave. At first, Raj scoffed at him, thinking he was joking. Bermudez then repeated himself, before Raj realized and acknowledged the seriousness of what Bermudez told him, and so, permitted him to go home.

66.    Dr. DeGroot, was present and overheard Bermudez explaining to Raj how he was feeling, and asking permission to leave, so he asked if he was OK or wants to talk to somebody. Plaintiff answered "no thank you, I have someone I talk to in these situations, that's why I want to leave."

67.    Bermudez had been consulting with a licensed Clinical Social Worker, Ms. Ina J. Watson ("Watson"). As soon as he got home, he called Watson, and consulted with her.

68.    After Raj allowed him to leave, Bermudez left the OR, went to the employees lounge to pick up his lunch. In the lounge, he saw the traveling scrub technician (who was supposed to relieve him for lunch break, but came in in the OR, 25 minutes late), and heard her describe, and

refer someone as "not nice and unapproachable" to Maria Sitson ("Sitson"), a nurse, who was also in the lounge. Maria responded: "Who, Marcus Bellamy?" (Marcus Bellamy, a surgical technician was also standing right there in the lounge). In response to Maria's question, Plaintiff's lunch break relief said: "No, him" (pointing at Bermudez). Rita, another surgical technician was also present, standing next to Bermudez. So, Plaintiff introduced himself to the female, traveling scrub tech, and said: "Rita, can you please tell her that I am not mean?" Rita replied "no he's a sweetheart." Bermudez hugged Rita and left around 12 noon.

69.    Bermudez, have been diagnosed with PTSD by the Department of Veteran Affairs ("VA"), and have had it for the past 10 years. Bermudez's manager, and direct supervisor Matt Geide has been aware of Plaintiff's PTSD condition for several years back, and HR and OCHD became aware of it too. In the past, when work was affecting him, because he was being overworked in the Neuro service, Bermudez informed Geide, requested time off because of his PTSD, and Geide had granted him permission to leave.

70.    The contractor travelling scrub technician, who is African-American female, in her 20s to 30s, came into the OR, twenty-five (25) minutes late to relieve Bermudez. He declined to take his break then, because, her lateness cut into his one-hour lunch break time, and as a result, threw the schedule for the next surgery out of sync, and contributed to his raised anxiety/anxiousness, that triggered his emotional and mental stress, which led to him wanting to leave work.

71.    Despite these facts, the travelling scrub technician was treated better than Bermudez. MGUH did not write-up her up; did not suspend her; and it did not fire her like it did Bermudez. It allowed her to continue working, until after her contract ran out and it failed to renew it.

**12/19/2023, Phone Call from Geide and Bushmiller to Bermudez Informing Him That They Were Giving Him A "Second, and Final Warning" For The 10/26/2023 Incident**

72.     On 12/19/2023, around 2:46 p.m., Bermudez received a phone call from Geide, and

Bushmiller, stating that they were giving him a "Second, and Final Warning" for his actions on

October 26, 2023, i.e., for leaving work with the charge nurse's permission, because he was not

feeling well. That warning phone call, was read to Plaintiff over the phone, and that call lasted

for about 10 minutes, with no document or paper given to him at that time.

73.     Bermudez was later given a copy of the warning letter that was read to him over the

phone. He refused to sign it because he did not agree with it. When he refused to sign it, Geide

told him: "it does not matter whether you sign it or not, because it will be in your file anyway."

74.     For the incident on 10/26/2023 – him asking for accommodation, or permission to leave

work, due to his PTSD symptoms, and even though he left with Raj's permission, he was written

up, referred to the hospitals OCHD for fitness for duty test, and suspended for almost 3 months.

75.     The written-up letter that Geide gave Bermudez, tates as follows:

> "Hector left his shift on Thursday 10/26 suddenly very angry and concerned our
> anesthesiologist and charge nurse. He stated he hates working with "these people"
> and not being able to be in the building anymore and having to go. This is the
> angriest they have ever seen him, and they stated he was "unwell" and
> "unhealthy." They offered to let him speak to someone, but he declined and left.
> He was recently written up for engaging in an argument with staff and he had
> stated after the fact that he was having problems controlling himself and his
> behavior when he gets angry. This further escalation of leaving his shift because
> he was so angry is concerning. I reached out to him via text message and he stated
> "feeling very ill" and "having a mental breakdown" and needing to "leave the
> building before it got any worse." I reached out to Brianna requesting a fitness for
> duty be completed before he is allowed to return to work to ensure the safety of
> himself and our staff."

76.     The above narrative was mainly falsehoods, or at best, an intentional, and complete

distortion of the true facts. It gives a terribly unfair, but a deliberate misleading impression,

created by Geide, which he wants to be taken as an accurate representation of what Plaintiff said

or did on the relevant date of 10/26/2023, even though he knew it was not true, because what he wrote was nothing but his own concocted inaccurate if not wholly false narrative.

77.    In other words, Geide intentionally put Bermudez in false light i.e., he portrayed Bermudez, in a false and highly offensive, and demeaning way, to management, OCHD, and also, Bermudez' coworkers, as words spreads, in its workplaces. Geide also, used same narrative, in the "fit for duty referral" form he gave OCHD. Yet, OCHD tested and rated him fit for duty.

78.    Geide was never present – he was not in his office on 10/26/2023, and he was never in OR 11, that day. Raj, the charge nurse, was never in OR 11, at the relevant time, on 10/26/2023, but at his desk outside the OR, where Bermudez came to tell him that he was not feeling well, and needed his permission to go home.  But Geide never referred to Raj by name as the source of his narrative quoted above. And he never gave the name of anyone he got his statements from.

79.    However, at both times when Geide used the above-quoted narrative against Bermudez, he never made it clear that he was never present, or witnessed any of the things he wrote, and negatively used for his write-up, and fitness for duty referral, against Bermudez, or that except for the text message he claims he had with Bermudez, all else in his write-up was based on a secondhand hearsay account by unnamed others, that have not been investigated, or corroborated by anyone. Yet, MGUH without more, used it against Bermudez towards its aim of firing him.

80.    On Bermudez' return to work after 2 plus months suspension, on or about 01/08/2024, he spoke with Raj, face to face. Raj told Bermudez that when he spoke to Geide, he told Geide, that Bermudez was calm, not angry, and left the OR without threatening anyone. Yet, when Geide spoke on the phone with Bermudez on 11/02/2023, while still on suspension, Geide told him that the staff in the OR were saying that they will need to wear a bulletproof vest if he was allowed to return to work the next day, because he was going to shoot up the hospital. Geide repeated same

to Plaintiff, when he returned to work. But he never gave any name of "the staff in the OR", who was talking about "wearing bulletproof vest". Geide did not include this in his write-up narrative.

81.     Geide did not state in his write-up that when he spoke to Plaintiff on the phone, and in person, he told him (without naming anyone), that people at work were saying that they "needed to wear a bulletproof vest if Plaintiff returned to work the next day because he was going to shoot the hospital up."

82.     Geide knew too well that Plaintiff is not an angry person, and has no such tendencies as he described in his above quoted narrative, yet, he put it out there, and made it his own, even though he knew and never believed it to be true or accurate for certain reasons.

83.     Geide knows Plaintiff very well, at least better than Plaintiff's other superiors at MGUH, because Geide and Bermudez have been "friends" for long, and on occasions, Geide had invited Bermudez and his family to socially spend time with his own family in his [Geide's] own home. During those visits, Geide never saw or thought Bermudez to be a threat to himself, or his family, or anyone around him, including his coworkers. Also, for the more than 17 years that Bermudez worked for MGUH, including more than ten (10) years after he had been diagnosed with PTSD, no one at MGUH, had complained about him posing a safety threat to himself or any coworker.

84.     Geide and Bermudez had been drinking buddies, and on many occasions, have had to sit and drink together, or play games online together while drinking, after work, most Friday nights.

85.     Geide, cannot name an occasion when Bermudez was angry with him, or acted in any way that he felt posed a threat to his safety, or to Plaintiff himself. Yet, part of Geide's narrative read: "I reached out to Brianna requesting a fitness for duty be completed before he is allowed to return to work to ensure the safety of himself and our staff." This is hostile, and shows animus.

86.    Bermudez, cannot recall Geide or any member of his family being in fear of their safety when he was around Geide, or when he and his family or him alone were invited, and visited Geide at his own home, which contradicts, and also, belies Geide's red herring of, "… to ensure the safety of himself and our staff" reason, given for referring Plaintiff to OCHD, for fitness for duty evaluation, and also Geide's statement to Plaintiff, and perhaps to others, that "the staff in the OR were saying that they will need to wear a bulletproof vest if Plaintiff was allowed to return to work the next day."

87.    For same incident on 10/26/23, i.e., asking to be permitted to leave work, because he was not feeling well and having PTSD symptoms, not only was Bermudez written up, he was also referred to MGUH's OCHD, for them to assess his fitness for duty, before he would be allowed to return to work, and suspended, before he was ultimately fired.

88.    Plaintiff, was put on what MGUH calls a "liberal leave" (aka paid suspension). He was put out, from 10/26/2023 till 01/7/2024. The period was not a "liberal leave" after all, because MGUH did not pay Plaintiff for the whole period he was supposed to be on liberal leave or paid suspension.

89.    For the two (2) months plus, that Bermudez was supposed to be paid, MGUH paid him for about only a month of that time. When MGUH stopped paying Plaintiff, he called and spoke to Brianna, who then told him to use his PTO hours. So, Plaintiff had no choice but to use all his PTO time which was about 60 hours, during the liberal leave period that MGUH reneged on its promise that it will pay him.

90.    When his PTO ran out, and he was still on "liberal leave", Plaintiff again, called and spoke to Brianna, and informed her that he has used all his PTO. Brianna, told Plaintiff that DC has a program that helps people who cannot pay their bills, and that Plaintiff should call the DC

government. In the end, Plaintiff went without pay during the remaining couple of weeks, of the "liberal leave" before he was permitted to return to work. During that period, MGUH paid all other employees, that it was supposed to pay wages, except Bermudez.

91.    MGUH actions in not paying Plaintiff as they promised him, and supposed to, amounts to unlawful, intentional and reckless discrimination, and unwarranted and unacceptable hostility in the work place, that was deliberately directed against Plaintiff.

92.    Forced into MGUH's "liberal leave"/suspension, for no legitimate reason, Plaintiff went into a state of depression, anxiety, and suicidal thoughts, and suffered weight loss, and insomnia. It got so bad, that he had to see a psychiatrist (Dr. M. Rao). Dr. Rao, put Plaintiff on antidepressants (Sertraline 50 mg once a day, and sleep aid pills prazosin 2 mg - a medication that is given to PTSD patients for nightmares). Also, his psychiatrist recommended increased sessions with his therapist social worker, from twice a month, to once a week.

93.    Plaintiff, strongly believes, that the write-ups he was given, and his suspension, are discriminatory, based on his sex, race, national origin, age, and disability. He was treated differently and worse, than certain of his colleagues: OR circulating nurse Candance McKee, a white Caucasian female, in  her mid-20s to 30s, who Plaintiff witnessed on occasions, ask to leave in the middle of her shift because of family issues, for example, when her father was sick, and was permitted, was never reprimanded, written up, or suspended; Sonja Richardson, black African-American female, on 12/30/21, (date of some verbal exchanges between Samantha Mathias, and Liberty Hilado regarding a sprayer equipment, for which Smith unlawfully fired Hilado), asked, and was permitted to leave, in the middle of her shift, was not reprimanded, written up, or suspended; and Dr. John Lynes, a white Caucasian male, had to leave, when he got news that his best friend had died, was also treated fairly and differently than Bermudez.

94.    MGUH does not have any written policy, forbidding employees from asking for permission to leave work at any time. Especially, when such employee, is not feeling well, and is on the verge of having an emotional and mental breakdown, and informs the charge nurse so, and on that basis, asks to leave work to take care of his health situation, and to avoid causing any distraction for the OR team during surgery, which is what Bermudez did. Also, to Plaintiff's knowledge, MGUH does not forbid its officers or agents, from permitting the kind of leave he asked for.

95.    When Plaintiff returned to work, on 01/08/2024, after almost three (3) months of unnecessary and wrongful suspension, he was still traumatized and had anxiety about going to work. So, because of that, on 01/25/2024, he spoke to, and requested a meeting with the OR director Smith, to have a conversation about his return to work and how he was feeling. He waited and hearing nothing further about scheduling a meeting from Smith, on 02/8/2024, Plaintiff sent Smith an email, reminding her of their conversation about scheduling a meeting. Finally, on or about 02/12/2024, Plaintiff met with Smith and Geide, in Smith's office.

96.    During their meeting, Plaintiff told both Smith and Geide, everything he went through while he was out of work including the holiday months of November/December, of 2023. Plaintiff told them that he is a combat veteran who suffers from PTSD. He invoked the ADA, and told them: "I am still in a very delicate place and I might need special accommodation." He also told them that he had anxiety about going to work, because at work, he felt targeted, isolated, and as if he was walking on egg shells. He told them that he tries to avoid contact with people as much as possible, and that he eats his lunch in the locker room, instead of the staff lounge, because he was so anxious, and "did not want to go through the same scenario of being put on

suspension again, as in the winter of 2023, or anything that can potentially cause him to lose his job."

97.    Also, during the meeting, Bermudez complained to Smith and Geide, that he was being treated discriminatorily and unfairly than others, because of his disability, and that Matt Geide's comment, made in October 2023, about him possibly shooting up the hospital if he was allowed to return back to work, was hostile, and created a toxic and hostile work environment for him, which he found intolerable, and unacceptable, because it makes him feel targeted, and isolated, and made him anxious and afraid to come to work.

98.    MGUH and its agents knew that Plaintiff has PTSD, which triggers stress and anxiety-related symptoms, in addition to the natural anxiety and stress, that comes with his job, as a surgical technician, which involves, many hours of nerve racking, delicate surgeries. Despite that, they failed to accommodate him based on his known disabilities. MGUH also failed to have any meaningful interactive discussion with him to help find the best way to accommodate him.

99.    Instead, all MGUH did, was discriminate, vilify, demean, caricature him, and portrait him in a negative and false light to MGUH's management and employees, and as such, created a hostile work environment for him. Not only that, Plaintiff was also written up, suspended, and ultimately fired, even though he was known to be disabled, and MGUH regarded him as such.

**<u>Ashley Clark's Actions In Refusing to Complete the Draping of the Microscope That Was to Be Used for The Next Surgery, and Her Unprofessional Behavior</u>**

100.    On 03/28/2024, around 12:30 p.m., Plaintiff's co-worker, Ashley Clark ("Ashley"), came to relieve him for a one-hour lunch break. Plaintiff gave Ashley a proper relief report: He told her how much medication was used, and informed her that they were going to utilize the Neuro Microscope, that he had put the sterile plastic covering half way i.e., that he had draped the microscope half way. The microscope in the OR that will be used for surgery, needs to be

covered completely to prevent the patient from getting an infection. Ashley, as a surgical tech, knows or should have known this.

101.    Bermudez started draping the microscope but did not finish it before Ashley, came to relieve him for his lunch break. So, before he left for his lunch break, Plaintiff informed Ashley, that the microscope that the surgeons were going to use for the surgery, needed to be completely draped. He told Ashley that he had already started the draping, and that Ashley should simply complete the draping of the microscope. Also, the circulating nurse in the OR, Eillen Gaffney ("Gaffney") told Plaintiff that she too, had also asked Ashley to finish the draping of the microscope while Plaintiff was out on his break, and Ashley refused to do it.

102.    When Plaintiff returned from his lunch break an hour later, he noticed that Ashley did nothing, and did not complete the draping of the microscope, and surgery with it, was to begin shortly. So, he asked Ashley, "is this how we do things now?"- referring to the incompletely covered neuro microscope. Ashley replied: "I left it exactly how you left it." Sensing that Ashley may not know how to do the draping, Plaintiff told Ashley that he is experienced, and can show her how to properly do it if she needed help.

103.    In response, Ashley asked Plaintiff, "did you have a good lunch?" Plaintiff answered "yes, thank you." Plaintiff then asked Ashley about her years of experience because he was not sure she knew how to drape the microscope. Then Ashley said, to Plaintiff, "you did not fully drape the scope and do you want me to take a picture of it for you?" Plaintiff replied, "yes please, so that I can show it to Matt Geide."

104.    While Plaintiff and Ashley were talking about the microscope, the surgeons asked for the microscope, as they needed to use it.  And then, Ashley, angrily and unprofessionally, stormed

out of the OR, and broke the sterile scrub protocol, by removing her scrub gown and gloves before Plaintiff had his gloves and gown on.

105.    After Ashley left the OR, Plaintiff proceeded and finished draping the microscope, before the surgeons used it. Plaintiff then asked the circulating nurse Eillen Gaffney to contact Alli the interim supervisor, (who was covering for Matt Geide while he was at a corporate meeting), and informed her about what happened with Ashley Clark, and for her to come to the OR. Alli came into the OR, saw the half-covered microscope, and both Alli and Bermudez, took photos of the incompletely draped microscope.

106.    The following day, on 03/29/2024, Plaintiff emailed both Smith and Geide, and informed them in a detailed email, about the events that took place, and also let them know, that it was not the first time Ashley Clark had behaved in such an unprofessional manner.

107.    On 04/01/2024, Plaintiff received a phone call from Smith, informing him that he has been put on paid suspension pending an investigation, and till further notice, regarding the events that took place on 03/28/2024, between him and Ashley Clarke, that Plaintiff described herein above. Later, Smith emailed the suspension letter to Plaintiff.

108.    On or about 04/26/2024, when Plaintiff did not receive a paycheck for that period, while still on suspension, he emailed Smith and the payroll office, and complained about not being paid, for that pay period. He also inquired as to whether he was still employed, because no one had spoken to him about his employment status, since his suspension on 04/01/2024. They apologized, but paid Plaintiff three days later, on 04/29/2024.

109.    During that pay period, when Defendant did not pay Plaintiff, and he had to email Smith and payroll to complain about it, Defendant paid all other employees that it was supposed to pay wages, except Bermudez. It was also, the first time, during his over 17 years working for

Defendant, that his wage was not paid when it was supposed to be paid, and there was no justification for Defendant to delay paying Plaintiff for additional three (3) days after he complained about not receiving his pay for that pay period.

110.    MGUH's actions in not paying Plaintiff as they promised him, and supposed to, and for further delaying payment for additional three days, amounts to unlawful, intentional and reckless discrimination, and unwarranted and unacceptable hostility in the work place, that was deliberately directed against Plaintiff.

111.    The next day, on 04/30/2024, Plaintiff received a phone call from Smith, with Ellen Bushmiller present as a witness, and was informed that his employment with MGUH, "has been terminated, for inappropriate behavior and comments."

**Defendant's Violation of Its Own Progressive Termination Policy and Disparate Treatment of Plaintiff Hector Bermudez**

112.    MGUH failed to follow its own progressive termination policy of giving its employees reasonable time to make needed or necessary corrections of their behavior or improvement in their performance as is relevant in the circumstances, by issuing the employee a "memorandum of expectations" and giving such employee, reasonable time to improve, before terminating their employment.

113.    In a memorandum of expectations, MGUH is supposed to detail in writing, performance areas or unacceptable behavior that an employee is short in performance, and needed to improve on. The memorandum should also state a reasonable time-frame when improvement is expected, and will be reviewed, before firing the employee.

114.    MGUH discriminatorily failed to give Bermudez, such a memorandum of expectation and reasonable time for him to improve whatever behavior MGUH wants him to improve, before

firing him on 04/30/2024, because in the past, MGUH had properly followed its progressive

discipline procedure, before firing certain employees, that were not in Plaintiff's protected class.

115.    Before Jordan Newmark ("Newmark") a white Caucasian, female in her 20s,

employment with Defendant was terminated in 2022, MGUH properly followed its progressive

discipline procedure. It issued Newmark a "memorandum of expectations" and gave her about

two months to improve before OR director Smith fired her, apparently because Smith felt

Newmark made no improvement during the time she was given to do so. Jordan Newmark, was

treated differently better than Bermudez.

116.    Also, Gail Humphries ("Humphries"), a white Caucasian female, was treated differently

and better than Bermudez. Before Humphries employment was terminated, she had been out

calling sick, and without reporting to work, for about 3 months – from November, 2021, to

February 2022, when she was fired. MGUH and its Management allowed her three months

before firing her. Bermudez was treated differently and worse.

117.    Bermudez' case is not the first time MGUH has discriminated against an employee by not

following its proper progressive discipline procedure before terminating that employee who is in

a protected class. Like in Bermudez' case, MGUH did not follow or apply its progressive

discipline procedure to Liberty Hilado. MGUH did not issue Hilado a memorandum of

expectation, or give her a reasonable time to improve, whatever Smith wanted her to improve,

like it issued Newmark (who was not in Hilado's protected class), before she was terminated.

**MGUH's Termination of Bermudez' Employment Was a Pre-Planned, Intentional and Reckless Unlawful Discriminatory Animus-Based Action**

118.    Bermudez, believes that MGUH pre-planned to fire him, like it did Liberty Hilado, a long

tenured, highly qualified, experienced, skilled and exceptionally competent female nurse, who

worked for MGUH, who just happened to be of Filipino race and national origin, and also, was a

member of another protected class, based on her age. MGUH has a discriminatory practice of casting away (firing) its older, experienced, and or, disabled employees, and replacing them with younger, inexperienced employees, in violation of federal and DC laws.

119.    Bermudez, worked for MGUH for almost two decades, before he was fired, for similar reasons that Hilado was. Bermudez, was in the interim, replaced by a younger nurse, with minimal work experience in surgical tech work, who MGUH pays a fraction of what it paid Bermudez, just as it was in Hilado's case, where her replacement too, was younger, inexperienced and also paid a fraction of what Hilado, was paid, at the time she was fired.

120.    MGUH has an unlawful practice of targeting certain employees for termination, based on their protected classes, for example, national origin, age, disability or sex, etc., without any objective legitimate reason. When MGUH targets or decides to terminate an OR employee, all it does, is look for something, or anything (no matter how insignificant, or irrelevant the reason or the issue, is in the overall scheme of things or circumstances), to peg that decision on, even if it has nothing to do with the employee's qualification or ability to do his job, as in this case and Hilado's.

121.    When it suits its whim, or bottom-line interests, to terminate any of its employees, MGUH and its agents, has a practice of doing so mercurially, without qualms, no matter how qualified, experienced and competent that employee is, or the number of years of the employee's life, that he/she had loyally dedicated in service to the hospital, just like Hilado, and now Bermudez did. It will do so, based on any flimsy, subjective, animus-based reason, and pretext cover up, that OR director, Smith can fabricate, or cook up, because MGUH, had already pre-planned to terminate that employee, even if the firing is in violation of federal and DC anti-discrimination laws, because MGUH is reckless as to whether or not its actions violate any laws.

122.    Bermudez believes that Defendant pre-planned to fire him because of his protected statuses, as highlighter herein above, and that MGUH's claimed reason of inappropriate behavior and comments, was nothing but a pretext and cover up for the true discriminatory reasons it terminated his employment.

123.    First, MGUH gave Bermudez indiscriminate "final written warnings" whether necessary, deserved or not.

124.    Second, MGUH and its management, referred Plaintiff to its hospital's OCHD, for fitness for duty evaluation, that clearly was not warranted, based on a false, or at best, an intentional and deliberately distorted narrative, that was concocted and intended to persuade the OCHD to give MGUH an easy pass to firing Plaintiff – assessing and certifying him to be not fit for duty.

125.    Plaintiff strongly believes that MGUH's actions, in referring him to OCHD for fitness for duty evaluation, was MGUH's first straight attempt at executing its pre-planned termination of Bermudez. It was intentional discrimination, harassment, and outrageously hostile. And it was also a pretext and cover up for MGUH's true intent and discriminatory motive of terminating Plaintiff based on his race, national origin, age, sex, and disability, and it had nothing to do with Bermudez' fitness for duty.

126.    It was not an accident or coincidence, that Plaintiff's direct supervisor Matt Geide, in his quoted narrative at ¶ 62 above, which was in his referral form to the hospital's OCHD, fitness for duty evaluation and certification, and also given to Plaintiff as a write up, contained the following with certain specific words: "I reached out to Brianna requesting a fitness for duty be completed before he is allowed to return to work **to ensure the safety of himself and our staff."** (emphasis added).

127.    There was no word spoken, or action taken by Plaintiff on 10/26/2023, that can in any

way, cause any honest, reasonable, objective, and fair-minded supervisor in Geide's position,

who was not present that day, and did not see or perceive for himself, what actually happened, to

conclude, that Bermudez was a direct threat to the health or safety of himself, or his coworkers.

128.    MGUH through its agent Geide, used the highlighted words above, as a pre-calculated

defense for terminating Plaintiff, because, had OCHD certified him as not fit for duty, MGUH

would have had its strongest reason or defense, for doing so, and as such, Plaintiff most certainly,

will have no recourse. MGUH's actions amount to invidious and insidious discrimination, an

unacceptable hostility in the workplace, and it is in violation of federal and DC anti-

discrimination laws.

129.    The OCHD was indirectly and unknowingly coopted to give MGUH the best reason they

could have used to fire Plaintiff. Like the OCHD, MGUH knew that Plaintiff was fit for duty,

and had been so, for over 17 years working for it, without any fitness for duty issues. MGUH

knew that there was no basis, for anyone to truthfully say that Bermudez was a safety threat to

himself or anyone else. But because MGUH had pre-planned to fire Plaintiff, no matter what, a

not fit for duty certification by the OCHD, would have done the trick for MGUH, and it would

not have mattered to its agents, if the facts on which the evaluation was based was fabricated, or

just a red herring.

130.    After evaluating Plaintiff, and despite Matt Geide's self-serving narrative, the OCHD,

certified Bermudez to be fit for duty and cleared him to return to work. When that happened,

MGUH's reactions to OCHD's certification, clearly spoke volumes, about the fact that the result

of the evaluation, was not what MGUH's officials hoped for or wanted – they did not want to

return Plaintiff back to his job.

131.     Weeks past after OCDH cleared Plaintiff to return to work, but MGUH's Management refused to let him return to work. Plaintiff had to go through another huddle of chasing his superiors on the phone or by email, asking why he has not been allowed to return to work, since OCHD cleared him for duty. He was passed from one manager to another, until Smith wrote him and informed him that although he had been cleared by OCHD, to return to work, "there is additional clearance that is being worked on at a system level" (whatever that means). In short, MGUH shifted the goal post for Bermudez, because, when they suspended him with pay, and informed him that he will be assessed for fitness for duty, he was never told, that after that, there will be a second-tier of clearance before he will be allowed to return to work.

132.     When the fitness for duty avenue failed, MGUH and its agents, looked for an alternative way or reason to fire Plaintiff – they looked for something – just as Smith did in Hilado's case. When Smith fired Plaintiff, she said it was "for inappropriate behaviors and comments." That is, work-related comments Plaintiff made, that in essence was nothing but urging her coworkers to do their job, during normal work hours, that amounts to nothing but the normal, and usual work place spats between co-workers (again, the exact same reason Smith gave, for firing Hilado).

**MGUH's Refusal to Hire Plaintiff When He Reapplied for His Old Position While It Is Still Open, And It Continues to Seek Candidates with His Qualifications for The Position**

133.     When Plaintiff was intentionally and wrongfully terminated, he had to mitigate his loss and damages, so he signed up with Indeed, and gave them his resume. When Plaintiff saw his former job being advertised, he applied for it.

134.     When the recruiter for MGUH, saw Plaintiff's resume, she noticed, perhaps without more, that Plaintiff had previously worked for MGUH. She contacted Plaintiff and asked him whether he wants to return to GUH.  Plaintiff responded that he would love to have a conversation about his return to his former place of work.

135.    Next, the recruiter and Plaintiff had a phone consultation about him returning back to work for the MGUH. During their phone discussion, Plaintiff told the recruiter that he wants to return to his old job. He also told the recruiter that he left MGUH in the first place, because MGUH fired him. The recruiter, then told Plaintiff that she will contact Smith and discuss with her about rehiring Plaintiff. After, and since then, MGUH's recruiter, never got back with Plaintiff either by phone or email. MGUH refused to rehire Plaintiff for the same discriminatory reasons it terminated his employment, including his disability.

136.    However, Plaintiff's former job position is still open and being advertised as being open on Indeed platform. MGUH still is advertising Plaintiff's former job position, with a beginning offer of about $20-51.00 per hour.

137.    Over seventeen (17) years ago, when Plaintiff started working for MGUH, he was given a written offer of $36 per hour which he accepted, but when he started working, he realized that his pay check was not reflecting that amount. He complained, but was browbeaten to accept and amount close to $18 per hour. He did, because he was afraid that he may be out of job if he did not accept it. That amount was increased later, to about $20 per hour. And 17 plus years later, at the time he was fired, he was paid about $55 per hour.

138.    At the moment, while MGUH is still looking for a trained surgical technician, it has in the interim, a young, and relatively new female nurse, Abigail ("Abby"), in her 20s to 30s, as Bermudez' replacement. Plaintiff trained Abby to do surgical tech work, for over six months before he was terminated. About a year after Plaintiff finished training Abby, he was terminated, and now being replaced by Abby.

139.    Before Plaintiff was fired, MGUH, asked Plaintiff to train Abby to do surgical tech work in the OR, during surgery. For over six (6) months, Plaintiff's direct supervisor Geide, scheduled

Abby in the OR, during surgeries that Plaintiff is scheduled to work on, so that he can teach

Abby how to do surgical work. For training Abby, MGUH paid Plaintiff an extra of about $1.50,

on top of his regular hourly pay.

140.    As a result of MGUH's intentional discrimination, hostility, and retaliation, that Plaintiff

has experienced on the basis of his race, national origin, age, sex, disability, he has suffered and

continues to suffer not only financial damages from loss of employment, but mental, emotional

distress and physical pain and suffering.

141.    Thus, Plaintiff seeks damages as a result of MGUH's unlawful conduct in an amount to

be proven at trial, as well as punitive damages, reasonable attorneys' fees and costs, pre and post

judgment interests, and other relief, as the court deems appropriate.

## CAUSES OF ACTION

### COUNT I
### Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
### Disparate Treatment, Terms and Conditions of Employment
### Race, National Origin and Sex/Gender

142.    Plaintiff hereby incorporates by reference the preceding paragraphs.

143.    Under Title VII, "it shall be an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.§ 2000e-2 (a).

144.    MGUH engaged in intentional unlawful employment practices in violation of 42 U.S.C.

§§ 2000e, et seq., by subjecting Plaintiff to discriminatory adverse actions, and by intentionally,

and recklessly, terminating him after over seventeen (17) years of dedicated, competent, and

outstanding service to MGUH, that was backed by superior skill, which he earned, mastered, and perfected, through practical experience, and a high sense of purpose.

145.    MGUH unlawfully and intentionally terminated Plaintiff, a disabled employee, who suffers from PTSD, based on a house of cards, ridiculous, and vague reason of "inappropriate behavior and comments" that has no legitimate basis, but a mere pretext and cover, especially when the alleged "inappropriate behavior and comments" were clearly triggered by PTSD symptoms, that Bermudez suffers from, and at times, struggles to control.

146.    MGUH also ignored the totality of the circumstances of Plaintiff 's alleged comments or behavior - the delicate surgeries being performed, with time being of the essence, and his coworker's failure to understand that, and to act professionally and cooperatively as a team, and also, the actions or decisions of OR director Smith, who seems to forget what her job, and that of the OR team is - to serve the patients and assist the doctors in performing patient surgeries, for safe and successful outcomes for the patients.

147.    Smith, filled with hatred, bias, and intentional discriminatory animus against Bermudez, was motivated to terminate Bermudez without a legitimate reason, but based on his race, national origin, sex/gender, even though Plaintiff, had at all times been qualified to work as a surgical tech, and have always performed his duties satisfactorily as is required of him.

148.    MGUH is an employer as defined under 42 U.S. Code § 2000e (b).

149.    Bermudez is a Hispanic American and, thus, a member of a protected class.

150.    MGUH terminated Bermudez, after over 17 years of loyal, and dedicated service to it, under circumstances that a fair and objective jury will find disparate treatment discrimination based on his race, national origin, sex/gender, because unlike certain of his co-workers who are

outside his protect class, MGUH took several unlawful adverse actions (mentioned herein), including, but not limited to giving written warnings, suspending him, and ultimately terminating him in violation of 42 U.S.C. §§ 2000e, et seq., and its own progressive discipline policy.

151.    At the time of the adverse employment actions, taken against Bermudez, including, but not limited to his termination, suspension, failure to hire, write ups, unwarranted fitness for duty evaluation, and hostile actions of not returning him to work, and not paying him on time, Bermudez was performing his job duties satisfactorily. MGUH never claimed otherwise.

152.    Bermudez, was treated differently and worse than his non-Hispanic employees, who were outside his protected class.

153.    Bermudez is a Hispanic male, and MGUH and its employees, management supervisors, representatives and agents were aware of this fact, and his race, national origin, sex/gender were motivating factors in MGUH's intentional disparate treatment, of termination, written warnings, suspensions, unwarranted fitness for duty evaluation referral, late payment of his wage, and further delay of the payment, when he complained about the late payment, and other adverse, hostile actions against him.

154.    MGUH, and its agents, engaged in unlawful employment practices in violation of 42 U.S.C. §§ 2000e, et seq., by subjecting Bermudez to discriminatory hostile treatments, by denying him, his civil rights, and equal terms, benefits and conditions of employment under the law, by unfairly not fully paying him during the period MGUH put him on "liberal leave" (aka paid suspension), and refused to return him to work, after he had been certified fit for duty, and to return to work, by the OCHD, based on his race, national origin, and sex/gender.

155.   MGUH's termination of Bermudez, after over seven teen (17) years of exemplary service to MGUH, was discriminatory, and intentional, to deprive him of equal terms, benefits, and conditions of his employment, that his white, female, and male Caucasian peers and black African American female coworkers at MGUH received.

156.   Bermudez' coworkers who are white Caucasian Americans, and black African American, who in fact, asked to leave work in the middle of their work schedule - same reasons or any reasons they gave, were treated more favorably, as they were never given a written warning, never suspended, never referred for assessment of fitness for duty, and were not ultimately terminated, and were not subjected to the kind of targeting, isolation, intimidation, humiliation, and outright harassment and hostility that Smith and Geide, in concert, subjected him to, based on his race, national origin, and sex/gender.

157.   MGUH, through its agent's animus-based, discriminatory actions, and treatment against Bermudez, leading to, and his termination, intentionally and unlawfully deprived Plaintiff of his rights and privileges of employment, on the basis of his race, national origin, sex/gender, in violation of 42 U.S. Code § 2000e et seq.

158.   The unlawful employment practices complained herein were intentional.

159.   MGUH's unlawful employment practices complained of herein, were directed against Bermudez with discriminatory animus, with malice or with reckless indifference to his protected rights under 42 U.S. Code § 2000e et seq., and MGUH's own progressive discipline policy.

160.   Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

161.    MGUH's unlawful and discriminatory actions against Bermudez, are based on his race, national origin, sex/gender, in violation of 42 U.S. Code § 2000e et seq. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

162.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, were in violation of 42 U.S. Code § 2000e et seq. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

163.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, in violation of 42 U.S. Code § 2000e et seq, and as such Bermudez, is entitled to compensatory, and punitive damages.

**COUNT II**
**Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.**
**Retaliation**

164.    Plaintiff hereby incorporates by reference the preceding paragraphs.

165.    Title VII, as amended, prohibits an employer from discriminating against any of its employee, for making charges, testifying, assisting, or participating in enforcement proceedings:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees…, because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3 (a).

166.    Plaintiff engaged in activities protected by Title VII, when he was retaliatorily suspended, on 3/29/2024, because during his meeting with Smith and Geide, he complained to them on 02/12/2024, that he has anxiety going to work, because he felt being targeted, isolated, that he felt he was working on egg shells, because he was afraid of being written up and suspended as he was in the fall of 2023; and when he complained about being treated discriminatorily and

unfairly, intimidated, and harassed by Geide's maligning hostile statement, which he concocted, that he [Geide] and other staff, needed bullet proof vests, if Plaintiff were to be allowed back at work because he "will shoot the hospital up", which Bermudez found intolerable, and totally unacceptable.

167.    Plaintiff also engaged in activities protected by Title VII, when he was retaliatorily terminated, because he complaint to Smith and the payroll office about him not being paid, for a certain pay period, and four (4) days later, he was terminated by Smith.

168.    MGUH's given reason for terminating Bermudez, is nothing but a pretext and cover up for its true discriminatory reasons for firing Plaintiff. MGUH's actions were intended to harm him, in violation of Title VII.

169.    MGUH retaliated against Bermudez, by its hostile harassment, and intimidating treatment, including but not limited to suspending, and terminating him, after he complained to Smith and Geide, about the unfair, isolated, hostile and intentionally discriminatory way that he has been treated, based on his race, national origin, sex/gender, in violation of Title VII.

170.    MGUH and its agent's actions were intentional, with reckless indifference to Plaintiff's rights.

171.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

172.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, due to his protected activities, are in violation of 42 U.S. Code § 2000e et seq.

41

173.    They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

174.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, because of his protected activities, in violation of 42 U.S. Code § 2000e et seq, and as such Bermudez, is entitled to compensatory, and punitive damages.

## COUNT III
### Title VII Harassment Hostile Work Environment

175.    Plaintiff hereby incorporates by reference the preceding paragraphs.

176.    MGUH engaged in unlawful employment practices in violation of Title VII, 42 U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Bermudez, to unwarranted harassment hostile work environment, when he was suffering with to the effects, and symptoms of military service-connected PTSD that he had suffered for over a decade while working for MGUH, when MGUH gave him written warnings; suspensions; referral for fitness for duty based on false, fabricated, defamatory, hostile narrative by Geide, that was intended to hurt Plaintiff's professional character, and employment status; putting Plaintiff on a "liberal leave" (aka paid suspension), but intimidatingly reneging on that promise, which caused Bermudez to go for weeks without any pay, after exhausting his PTO; failing to pay Bermudez during a second suspension, during a certain pay period and further delaying that payment for another three (3) days after Plaintiff complained about not being paid; targeted, singled out, and isolated; when MGUH refused to return Bermudez to work, and "moved the goal post" further for him, after the hospital's OCHD had certified him as fit for duty, and to be returned to work; and when MGUH ultimately intentionally and discriminatorily terminated him, because they do not want to accommodate him as a disabled employee, with a PTSD disability.

177.    MGUH and its agents, created an intolerable and uncomfortable, harassment hostile work environment, that impacted Bermudez' ability to do his job, in violation of Title VII, and MGUH progressive discipline and anti-harassment hostile work environment policy

178.    MGUH harassed and subjected Plaintiff, to intolerable, unwarranted, and unwanted harassment hostile work environment, and disparate treatment by Smith and Geide, with the tacit support or negligence of MGUH's management officials and agents, that did not intervene, properly investigate, and prevent Smith and Geide from harassing, intimidating, humiliating, and ultimately terminating Plaintiff, for no legitimate reason, but to damage his employment career at MGUH, in violation Title VII.

179.    MGUH harassed and subjected to harassment, disparate working conditions and a hostile work environment through its management supervisors, and agents, when MGUH's OR manager took adverse actions as listed above at ¶ 176, against Plaintiff for no legitimate reason, in violation Title VII.

180.    MGUH's actions against Bermudez, amounts to harassment and hostility, because it created a hostile work environment that was intolerable, that impacted his ability to do his job and in continuance of that hostility, Plaintiff's employment, was intentionally terminated in violation Title VII.

181.    Plaintiff found MGUH and its agents' actions against him very repugnant and unacceptable. He complained to his superiors several about the discriminatory practices actions that were directed at him in the workplace, that caused a lot of anxiety about going to work, but MGUH's management officials, paid no attention, or tried to investigate for example, why he was targeted, singled out or isolated.

182.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

183.    MGUH and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, in violation of 42 U.S. Code § 2000e et seq. As MGUH's actions are in violation of the law and as such Bemudez, is entitled to an award of compensatory, and punitive damages.

**COUNT IV**
**Failure to Hire on the Basis of Sex/Gender 42 U.S.C. § 2000e-2(a)(1)**

184.    Plaintiff hereby incorporates by reference the preceding paragraphs

185.    On or about August 28, 2024, MGUH engaged in an unlawful employment practice in violation of 42 U.S.C. § 2000e-2(a)(1), when it failed to rehire Bermudez, a male qualified surgical technician, due to his sex/gender.

186.    Plaintiff's interim replacement, is a young female nurse who is under 40 years of age, without the educational background as a surgical technician, or the experience as Bermudez. While MGUH refused to rehire Bermudez, it kept looking for someone with Bermudez qualification, as an OR surgical technician.

187.    The effect of the unlawful employment practice complained of in ¶ 60, above, has been to deprive Bermudez, of equal employment opportunities and otherwise adversely affect his position or status as an applicant for employment because of his sex/gender.

188.    The unlawful, discriminatory employment practices described above were deliberately intentional.

189.    The unlawful employment practices described above were done with malice, or with

reckless indifference to the federally protected rights of Bermudez.

**COUNT V**
**Violation of 42 U.S.C. § 1981**
**Intentional Race/Ethnicity Discrimination Disparate Treatment**

190.    Plaintiff hereby incorporates by reference the preceding paragraphs.

Section 1981, 42 U.S.C. § 1981states:

(a)    Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right
in every State and Territory to make and enforce contracts, to sue, be parties, give
evidence, and to the full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white citizens, and shall be
subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
kind, and to no other.

(b)    "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the
making, performance, modification, and termination of contracts, and the
enjoyment of all benefits, privileges, terms, and conditions of the contractual
relationship.

191.    MGUH engaged in intentional unlawful employment practices in violation of 42 U.S.C. §

1981, by subjecting Bermudez to discriminatory adverse actions, and by intentionally, and

recklessly, terminating him after over seventeen (17) years of dedicated, competent, and

outstanding service to MGUH, that was backed by superior skill, which he earned, mastered, and

perfected, through practical experience, and a high sense of purpose.

192.    MGUH unlawfully and intentionally terminated Plaintiff, a disabled employee, who

suffers from PTSD, based on a house of cards, ridiculous, and vague reason of "inappropriate

behavior and comments" that has no legitimate basis, but a mere pretext and cover, especially

when the alleged "inappropriate behavior and comments" were clearly triggered by PTSD

symptoms, that Bermudez suffers from, and at times, struggles to control.

193.    MGUH also ignored the totality of the circumstances of Bermudez' alleged comments or behavior - the delicate surgeries being performed, with time being of the essence, and his coworker's failure to understand that, and to act professionally and cooperatively as a team, and also, the actions or decisions of OR director Smith, who seems to forget what her job, and that of the OR team is - to serve the patients and assist the doctors in performing patient surgeries, for safe and successful outcomes for the patients.

194.    Smith, filled with hatred, bias, and intentional discriminatory animus against Bermudez, was motivated to terminate Bermudez without a legitimate reason, but based on his race or ethnicity, even though Plaintiff, had at all times been qualified to work as a surgical tech, and have always performed his duties satisfactorily as is required of him.

195.    MGUH is an employer as defined under 42 U.S.C. § 1981.

196.    Bermudez is a Hispanic American and, thus, a member of a protected class.

197.    MGUH terminated Bermudez, after over 17 years of loyal, and dedicated service to it, under circumstances that a fair and objective jury will find disparate treatment discrimination based on his race, national origin, sex/gender, because unlike certain of his co-workers who are outside his protect class, MGUH took several unlawful adverse actions (mentioned herein), including, but not limited to giving written warnings, suspending him, and ultimately terminating him in violation of 42 U.S.C. § 1981, and its own progressive discipline policy.

198.    At the time of the adverse employment actions, taken against Bermudez, including, but not limited to his termination, suspension, failure to hire, write ups, unwarranted fitness for duty evaluation, and hostile actions of not returning him to work, and not paying him on time, Bermudez was performing his job duties satisfactorily. MGUH never claimed otherwise.

199.    Bermudez, was treated differently and worse than his non-Hispanic employees, who were outside his protected class.

200.    Bermudez is a Hispanic American male, and MGUH and its employees, management supervisors, representatives and agents were aware of this fact, and because of his race or ethnicity, MGUH's intentionally and discriminatorily subjected him to disparate treatments, of termination, written warnings, suspensions, unwarranted fitness for duty evaluation referral, late payment of his wage, and further delay of the payment, when he complained about the late payment, and other adverse, hostile actions against him.

201.    MGUH, and its agents, engaged in unlawful employment practices in violation of 42 U.S.C. § 1981, by subjecting Bermudez to discriminatory hostile treatments, by denying him, his civil rights, and equal terms, benefits and conditions of employment under the law, by unfairly not fully paying him during the period MGUH put him on "liberal leave" (aka paid suspension), and refused to return him to work, after he had been certified fit for duty, and to return to work, by the OCHD, based on his race or ethnicity.

202.    MGUH's termination of Bermudez, after over seven teen (17) years of exemplary service to MGUH, was discriminatory, and intentional, to deprive him of equal terms, benefits, and conditions of his employment, that his white, female, and male Caucasian peers and black African American female coworkers at MGUH received.

203.    Bermudez' coworkers who are white Caucasian Americans, and black African American, who in fact, asked to leave work in the middle of their work schedule - same reasons or any reasons they gave, were treated more favorably, as they were never given a written warning, never suspended, never referred for assessment of fitness for duty, and were not ultimately terminated, and were not subjected to the kind of targeting, isolation, intimidation, humiliation,

and outright harassment and hostility that Smith and Geide, in concert, subjected him to, based on his race.

204.    MGUH, through its agent's animus-based, discriminatory actions, and treatment against Bermudez, leading to, and his termination, intentionally and unlawfully deprived Plaintiff of his rights and privileges of employment, on the basis of his race, in violation of 42 U.S.C. § 1981.

205.    The unlawful employment practices complained herein were intentional.

206.    MGUH's unlawful employment practices complained of herein, were directed against Bermudez with discriminatory animus, with malice or with reckless indifference to his protected rights under 42 U.S.C. § 1981, and MGUH's own progressive discipline policy.

207.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

208.    MGUH's unlawful and discriminatory actions against Bermudez, are based on his race, in violation of 42 U.S.C. § 1981. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

209.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, were in violation of 42 U.S.C. § 1981. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

210.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her

rights and privileges as their employee, in violation of 42 U.S.C. § 1981, and as such Bermudez,

is entitled to compensatory, and punitive damages.

### COUNT VI
### Section 1981 Retaliation

211,    Plaintiff hereby incorporates by reference the preceding paragraphs.

212.    Section 1981 prohibits an employer from discriminating against any of its employee, for

making charges, testifying, assisting, or participating in enforcement proceedings:

> "It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees…, because she has opposed any practice made an unlawful
> employment practice by this subchapter, or because she has made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding, or hearing under
> this subchapter." 42 U.S.C. § 1981.

213.    Plaintiff engaged in activities protected by 42 U.S.C. § 1981, when he was retaliatorily

suspended, on 3/29/2024, because during his meeting with Smith and Geide, he complained to

them on 02/12/2024, that he has anxiety going to work, because he felt being targeted, isolated,

that he felt he was working on egg shells, because he was afraid of being written up and

suspended as he was in the fall of 2023; and when he complained about being treated

discriminatorily and unfairly, intimidated, and harassed by Geide's maligning hostile statement,

which he concocted, that he [Geide] and other staff, needed bullet proof vests, if Plaintiff were to

be allowed back at work because he "will shoot the hospital up", which Bermudez found

intolerable, and totally unacceptable.

214.    Plaintiff also engaged in activities protected by 42 U.S.C. § 1981, when he was

retaliatorily terminated, because he complaint to Smith and the payroll office about him not

being paid, for a certain pay period, and four (4) days later, he was terminated by Smith.

215.    MGUH's given reason for terminating Bermudez, is nothing but a pretext and cover up for its true discriminatory reasons for firing Plaintiff. MGUH's actions were intended to harm him, in violation of 42 U.S.C. § 1981.

216.    MGUH retaliated against Bermudez, by its hostile harassment, and intimidating treatment, including but not limited to suspending, and terminating him, after he complained to Smith and Geide, about the unfair, isolated, hostile and intentionally discriminatory way that he has been treated, based on his race or ethnicity, in violation of 42 U.S.C. § 1981.

217.    MGUH and its agent's actions were intentional, with reckless indifference to Plaintiff's rights.

218.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

219.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, due to his protected activities, are in violation of 42 U.S.C. § 1981.

220.    They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

221.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, because of his protected activities, in violation of 42 U.S.C. § 1981, and as such Bermudez, is entitled to compensatory, and punitive damages.

**COUNT VII**
**Section 1981 Harassment Hostile Work Environment**

222.    Plaintiff hereby incorporates by reference the preceding paragraphs.

223.    MGUH engaged in unlawful employment practices in violation of 42 U.S.C. § 1981, by subjecting Bermudez, to unwarranted harassment hostile work environment, when he was suffering with to the effects, and symptoms of military service-connected PTSD that he had suffered for over a decade while working for MGUH, when it gave him written warnings; suspensions; referral for fitness for duty based on false, fabricated, defamatory, hostile narrative by Geide, that was intended to hurt Plaintiff's professional character, and employment status; putting Plaintiff on a "liberal leave" (aka paid suspension), but intimidatingly reneging on that promise, which caused Bermudez to go for weeks without any pay, after exhausting his PTO; failing to pay Bermudez during a second suspension, during a certain pay period and further delaying that payment for another three (3) days after Plaintiff complained about not being paid; targeted, singled out, and isolated; when Defendant refused to return Bermudez to work, and "moved the goal post" further for him, after the hospital's OCHD had certified him as fit for duty, and to be returned to work; and when Defendant ultimately intentionally and discriminatorily terminated him, because they do not want to accommodate him as a disabled employee, with a PTSD disability.

224.    MGUH and its agents, created an intolerable and uncomfortable, harassment hostile work environment, that impacted Bermudez' ability to do his job, in violation of 42 U.S.C. § 1981, and MGUH progressive discipline and anti-harassment hostile work environment policy

225.    MGUH harassed and subjected Plaintiff, to intolerable, unwarranted, and unwanted harassment hostile work environment, and disparate treatment by Smith and Geide, with the tacit support or negligence of MGUH's management officials and agents, that did not intervene, properly investigate, and prevent Smith and Geide from harassing, intimidating, humiliating, and

ultimately terminating Plaintiff, for no legitimate reason, but to damage his employment career at MGUH, in violation 42 U.S.C. § 1981.

226.    MGUH, harassed and subjected to harassment, disparate working conditions and a hostile work environment through its management supervisors, and agents, when Defendant's OR manager took adverse actions as listed above at ¶ 223, against Plaintiff for no legitimate reason, in violation 42 U.S.C. § 1981.

227.    MGUH's actions against Bermudez, amounts to harassment and hostility, because it created a hostile work environment that was intolerable, that impacted his ability to do his job and in continuance of that hostility, Plaintiff's employment, was intentionally terminated in violation of 42 U.S.C. § 1981.

228.    Plaintiff found MGUH and its agents' actions against him very repugnant and unacceptable. He complained to his superiors several about the discriminatory practices actions that were directed at him in the workplace, that caused a lot of anxiety about going to work, but MGUH's management officials, paid no attention, or tried to investigate for example, why he was targeted, singled out or isolated.

229.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

230.    MGUH and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, in violation of 42 U.S.C. § 1981. As MGUH's actions are in violation of the law and as such Bermudez, is entitled to an award of compensatory, and punitive damages.

## COUNT VIII
## Disparate Treatment
## Violation of ADEA of 1967, 29 U.S.C. § 623 (a)

231.    Plaintiff hereby incorporates by reference the preceding paragraphs.

232.    Age Discrimination Act of 1967, 29 U.S.C. § 623 (a), provides:

> (a) Employer practices: It shall be unlawful for an employer—

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

> (3) to reduce the wage rate of any employee in order to comply with this chapter. 29 U.S.C. § 623 (a)(1)(2)(3).

233.    At all times during the relevant period, Bermudez has been MGUH's employee, and MGUH has been his employer.

234.    Plaintiff Bermudez, was over 40 years of age, when on 04/30/2024, and MGUH terminated his employment, and replaced him with a younger, female nurse, in her 20s to 30s, who has no formal, educational surgical technician training, like Bermudez, and has no less practical experience when compared to Plaintiff's 17 years practical experience.31This amounts to discrimination on account of age, and in violation of 29 U.S. Code § 623.

235.    Bermudez was treated discriminatorily based on his age, when he was written up, suspended, and referred to OCHD for fitness for duty evaluation, just because he asked to leave work because he was not feeling well, and had emotional stress, due to a serious health matter with his daughter, while Cadace McKee, who did the same and left work in the middle of his work schedule, when her father was sick, was not subjected to the kind of treatment that he was. Candace is in her mid-20s to 30s, and she was never disciplined.

236.    MGUH discriminated against Bermudez, because of his age, when it failed to follow its progressive discipline procedure, and to give him a "memorandum of expectations" and reasonable time to improve whatever behavior or performance it claims he needs to improve. But MGUH provided such "memorandum of expectations" and reasonable time to improve, to Jordan Nemark, who at the time in 2022, when she was fired, was in her mid-20s - 30s. MGUH's disparate treatment of Plaintiff because of his age, is in violation of 29 U.S. Code § 623 (a).

237.    For over 17 years Plaintiff worked for MGUH with dedication and loyalty. During those years, Plaintiff acquired on the job experience and tremendous skills that highly benefited MGUH. Also, during the almost two decades, working for MGUH his salary gradually rose. However, because of his age, and for the benefit of its bottom-line, MGUH instituted a discriminatory and unlawful practice of targeting its older and veteran workers who earn substantially more than new and younger hires, for termination. This, also, amounts to age discrimination, and it is in violation of the ADEA of 1967.

238.    By terminating older workers like Plaintiff, MGUH achieves its bottom-line policy by way of discriminatory termination of older surgical technicians like Bermudez, not on account of their ability to perform, or wrongdoing, but just because they are older.

239.    By terminating Plaintiff, and replacing him with a younger employee, MGUH can use the same or about the same salary it pays Bermudez to pay one and half, or even two young, fresh from school, and inexperienced surgical techs to do his job, to serve, its bottom-line interest, but not so much the interests of the patients they serve, who need, and deserve all the skilled, and experienced nurses, like Bermudez, that they could have, to serve them. This, practice amounts to discrimination on account of age, in violation of the ADEA.

240.    Because of MGUH's supervisors, and agents' discriminatory actions, Bermudez suffered,

and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional

distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him

to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

241.    Because MGUH, its management and agents, intentionally discriminated against

Bermudez in her employment, on account of her age, MGUH, is liable to Plaintiff for

compensatory and punitive damages.

**COUNT IX**
**Retaliation**
**Violation of ADEA of 1967, 29 U.S.C. § 623 (a)**

242.    Plaintiff hereby incorporates by reference the preceding paragraphs.

29 U.S. Code § 623 (d) provides:

> It shall be unlawful for an employer to discriminate against any of his employees
> or applicants for employment, for an employment agency to discriminate against
> any individual, or for a labor organization to discriminate against any member
> thereof or applicant for membership, because such individual, member or
> applicant for membership has opposed any practice made unlawful by this
> section, or because such individual, member or applicant for membership has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or litigation under this chapter. 29 USC Section 623(d).

243.    The ADEA, like Title VII, prohibits an employer from retaliating against an employee,

because such an employee complains of discrimination or participates in enforcing the retaliation

provisions. The ADEA retaliation provisions also follow the Title VII prohibitions in form and

application.

244.    Plaintiff engaged in activities protected by 29 U.S. Code § 623(d), when he was

retaliatorily suspended, on 3/29/2024, because during his meeting with Smith and Geide, he

complained to them on 02/12/2024, that he has anxiety going to work, because he felt being

targeted, isolated, that he felt he was working on egg shells, because he was afraid of being

written up and suspended as he was in the fall of 2023; and when he complained about being treated discriminatorily and unfairly, intimidated, and harassed by Geide's maligning hostile statement, which he concocted, that he [Geide] and other staff, needed bullet proof vests, if Plaintiff were to be allowed back at work because he "will shoot the hospital up", which Bermudez found intolerable, and totally unacceptable.

245.    Plaintiff also engaged in activities protected by 29 U.S. Code § 623(d), when he was retaliatorily terminated, because he complaint to Smith and the payroll office about him not being paid, for a certain pay period, and four (4) days later, he was terminated by Smith.

246.    MGUH's given reason for terminating Bermudez, is nothing but a pretext and cover up for its true discriminatory reasons for firing Plaintiff. MGUH's actions were intended to harm him, in violation of 29 U.S. Code § 623(d).

247.    MGUH retaliated against Bermudez, by its hostile harassment, and intimidating treatment, including but not limited to suspending, and terminating him, after he complained to Smith and Geide, about the unfair, isolated, hostile and intentionally discriminatory way that he has been treated, based on his race or ethnicity, in violation of 29 U.S. Code § 623(d).

248.    MGUH and its agent's actions were intentional, with reckless indifference to Plaintiff's rights.

249.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

250.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, due to his protected activities, are in violation of 29 U.S. Code § 623(d).

251.    They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

252.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, because of his protected activities, in violation of 29 U.S. Code § 623(d), and as such Bermudez, is entitled to compensatory, and punitive damages.

**COUNT X**
**Violation of ADEA Harassment Hostile Work Environment**

253.    Plaintiff hereby incorporates by reference the preceding paragraphs.

254.    MGUH engaged in unlawful employment practices in violation of the ADEA, by subjecting Bermudez, to unwarranted harassment hostile work environment, when he was suffering with to the effects, and symptoms of military service-connected PTSD that he had suffered for over a decade while working for MGUH, when it gave him written warnings; suspensions; referral for fitness for duty based on false, fabricated, defamatory, hostile narrative by Geide, that was intended to hurt Plaintiff's professional character, and employment status; putting Plaintiff on a "liberal leave" (aka paid suspension), but intimidatingly reneging on that promise, which caused Bermudez to go for weeks without any pay, after exhausting his PTO; failing to pay Bermudez during a second suspension, during a certain pay period and further delaying that payment for another three (3) days after Plaintiff complained about not being paid; targeted, singled out, and isolated; when Defendant refused to return Bermudez to work, and "moved the goal post" further for him, after the hospital's OCHD had certified him as fit for duty, and to be returned to work; and when Defendant ultimately intentionally and discriminatorily terminated him, because they do not want to accommodate him as a disabled employee, with a PTSD disability.

255.    MGUH and its agents, created an intolerable and uncomfortable, harassment hostile work environment, that impacted Bermudez' ability to do his job, in violation of the ADEA, and MGUH progressive discipline and anti-harassment hostile work environment policy

256.    MGUH harassed and subjected Plaintiff, to intolerable, unwarranted, and unwanted harassment hostile work environment, and disparate treatment by Smith and Geide, with the tacit support or negligence of MGUH's management officials and agents, that did not intervene, properly investigate, and prevent Smith and Geide from harassing, intimidating, humiliating, and ultimately terminating Plaintiff, for no legitimate reason, but to damage his employment career at MGUH, in violation of the ADEA.

257.    MGUH, harassed and subjected to harassment, disparate working conditions and a hostile work environment through its management supervisors, and agents, when MGUH's OR manager took adverse actions as listed above at ¶ 254, against Plaintiff for no legitimate reason, in violation of the ADEA.

258.    MGUH's actions against Bermudez, amounts to harassment and hostility, because it created a hostile work environment that was intolerable, that impacted his ability to do his job and in continuance of that hostility, Plaintiff's employment, was intentionally terminated in violation of the ADEA.

259.    Plaintiff found MGUH and its agents' actions against him very repugnant and unacceptable. He complained to his superiors several about the discriminatory practices actions that were directed at him in the workplace, that caused a lot of anxiety about going to work, but MGUH's management officials, paid no attention, or tried to investigate for example, why he was targeted, singled out or isolated.

260    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

261.    MGUH and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, in violation of 42 U.S.C. § 1981. As MGUH's actions are in violation of the law and as such Bermudez, is entitled to an award of compensatory, and punitive damages.

## COUNT XI
## Failure to Hire on the Basis of Age ADEA, 29 U.S.C. § 623 (a) Et Seq.

262.    Plaintiff hereby incorporates by reference the preceding paragraphs

263.    On or about August 28, 2024, MGUH engaged in an unlawful employment practice in violation of Section 29 U.S.C. § 623 et seq., when it failed to rehire Bermudez, a male, due to his sex/gender.

264.    Plaintiff's interim replacement, is a young female nurse who is under 40 years of age, without the educational background as a surgical technician, or the experience as Bermudez. While MGUH refused to rehire Bermudez, it kept looking for someone with Bermudez qualification, as an OR surgical technician.

265.    The effect of the unlawful employment practice complained of in ¶ 60, above, has been to deprive Bermudez, of equal employment opportunities and otherwise adversely affect his position or status as an applicant for employment because of his age.

266.    The unlawful, discriminatory employment practices described above were deliberately intentional.

267.    The unlawful employment practices described above were done with malice, or with

reckless indifference to the federally protected rights of Bermudez.

**COUNT XII**
**Discrimination: Violation of DCHRA**
**Disparate Treatment, Terms and Conditions of Employment**
**Race, National Origin, and Sex/Gender**

268.    Plaintiff hereby incorporates by reference the preceding paragraphs.

269.    The District of Columbia Human Rights Act ("DCHRA") prohibits an employer from

discriminating against an employee based on their race, and national origin, and states:

> (a) General. — It shall be an unlawful discriminatory practice to do any of the
> following acts, wholly or partially for a discriminatory reason based upon the actual or
> perceived: race, color, religion, national origin, sex, age, marital status, personal
> appearance, sexual orientation, gender identity or expression, family responsibilities,
> genetic information, disability, matriculation, political affiliation, status as a victim or
> family member of a victim of domestic violence, a sexual offense, or stalking, or credit
> information of any individual:

> (1)(A) By an employer. — To fail or refuse to hire, or to discharge, any
> individual; or otherwise, to discriminate against any individual, with respect to his or her
> compensation, terms, conditions, or privileges of employment, including promotion; or to
> limit, segregate, or classify his or her employees in any way which would deprive or tend
> to deprive any individual of employment opportunities, or otherwise adversely affect his
> or her status as an employee." DC Code § 2–1402.11(a), and (a)(1))A).

270.    MGUH engaged in intentional unlawful employment practices in violation of the

DCHRA, by subjecting Bermudez to discriminatory adverse actions, and by intentionally, and

recklessly, terminating him after over seventeen (17) years of dedicated, competent, and

outstanding service to MGUH, that was backed by superior skill, which he earned, mastered, and

perfected, through practical experience, and a high sense of purpose.

271.    MGUH unlawfully and intentionally terminated Plaintiff, a disabled employee, who

suffers from PTSD, based on a house of cards, ridiculous, and vague reason of "inappropriate

behavior and comments" that has no legitimate basis, but a mere pretext and cover, especially

when the alleged "inappropriate behavior and comments" were clearly triggered by PTSD symptoms, that Bermudez suffers from, and at times, struggles to control.

272.    MGUH also ignored the totality of the circumstances of Bermudez' alleged comments or behavior - the delicate surgeries being performed, with time being of the essence, and his coworker's failure to understand that, and to act professionally and cooperatively as a team, and also, the actions or decisions of OR director Smith, who seems to forget what her job, and that of the OR team is - to serve the patients and assist the doctors in performing patient surgeries, for safe and successful outcomes for the patients.

273.    Smith, filled with hatred, bias, and intentional discriminatory animus against Bermudez, was motivated to terminate Bermudez without a legitimate reason, but based on his race, national origin, sex/gender, even though Plaintiff, had at all times been qualified to work as a surgical tech, and have always performed his duties satisfactorily as is required of him.

274.    Defendant is an employer as defined under the DCHRA.

275.    Bermudez is a Hispanic American and, thus, a member of a protected class.

276.    MGUH terminated Bermudez, after over 17 years of loyal, and dedicated service to it, under circumstances that a fair and objective jury will find disparate treatment discrimination based on his race, national origin, sex/gender, because unlike certain of his co-workers who are outside his protect class, MGUH took several unlawful adverse actions (mentioned herein), including, but not limited to giving written warnings, suspending him, and ultimately terminating him in violation of the DCHRA, and its own progressive discipline policy.

277.    At the time of the adverse employment actions, taken against Bermudez, including, but not limited to his termination, suspension, failure to hire, write ups, unwarranted fitness for duty

evaluation, and hostile actions of not returning him to work, and not paying him on time, Bermudez was performing his job duties satisfactorily. MGUH never claimed otherwise.

278.    Bermudez, was treated differently and worse than his non-Hispanic employees, who were outside his protected class.

279.    Bermudez is a Hispanic American male, and MGUH and its employees, management supervisors, representatives and agents were aware of this fact, and his race, national origin, sex/gender were motivating factors in MGUH's intentional disparate treatment, of termination, written warnings, suspensions, unwarranted fitness for duty evaluation referral, late payment of his wage, and further delay of the payment, when he complained about the late payment, and other adverse, hostile actions against him.

280.    MGUH, and its agents, engaged in unlawful employment practices in violation of the DCHRA, by subjecting Bermudez to discriminatory hostile treatments, by denying him, his civil rights, and equal terms, benefits and conditions of employment under the law, by unfairly not fully paying him during the period MGUH put him on "liberal leave" (aka paid suspension), and refused to return him to work, after he had been certified fit for duty, and to return to work, by the OCHD, based on his race, national origin, and sex/gender.

281.    MGUH's termination of Bermudez, after over seven teen (17) years of exemplary service to MGUH, was discriminatory, and intentional, to deprive him of equal terms, benefits, and conditions of his employment, that his white, female, and male Caucasian peers and black African American female coworkers at MGUH received.

282.    Bermudez' coworkers who are white Caucasian Americans, and black African American, who in fact, asked to leave work in the middle of their work schedule - same reasons or any reasons they gave, were treated more favorably, as they were never given a written warning,

never suspended, never referred for assessment of fitness for duty, and were not ultimately terminated, and were not subjected to the kind of targeting, isolation, intimidation, humiliation, and outright harassment and hostility that Smith and Geide, in concert, subjected him to, based on his race, national origin, and sex/gender.

283.    MGUH, through its agent's animus-based, discriminatory actions, and treatment against Bermudez, leading to, and his termination, intentionally and unlawfully deprived Plaintiff of his rights and privileges of employment, on the basis of his race, national origin, sex/gender, in violation of the DCHRA.

284.    The unlawful employment practices complained herein were intentional.

285.    MGUH's unlawful employment practices complained of herein, were directed against Bermudez with discriminatory animus, with malice or with reckless indifference to his protected rights under the DCHRA, and MGUH's own progressive discipline policy.

286.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

287.    MGUH's unlawful and discriminatory actions against Bermudez, are based on his race, national origin, sex/gender, in violation of the DCHRA. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

288.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, were in violation of the DCHRA. They were intentional, willful, malicious, and were intended to injure

Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

289.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, in violation of the DCHRA, and as such Bermudez, is entitled to compensatory, and punitive damages.

## COUNT XIII
### Violation of DCHRA Age Discrimination

290.    Plaintiff hereby incorporates by reference the preceding paragraphs.

291.    The DCHRA, age discrimination provisions, are fashioned like the federal counterpart, ADEA of 1967, 29 U.S. Code § 623, and is similarly applicable in all respects.

292.     At all times during the relevant period, Bermudez has been MGUH's employee, and Defendant has been his employer.

293.    Plaintiff Bermudez, was over 40 years of age, when on 04/30/2024, and MGUH terminated his employment, and replaced him with a younger, female nurse, in her 20s to 30s, who has no formal, educational surgical technician training, like Bermudez, and has no less practical experience when compared to Plaintiff's 17 years practical experience.31This amounts to discrimination on account of age, and in violation of the DCHRA.

294.    Bermudez was treated discriminatorily based on his age, when he was written up, suspended, and referred to OCHD for fitness for duty evaluation, just because he asked to leave work because he was not feeling well, and had emotional stress, due to a serious health matter with his daughter, while Cadace McKee, who did the same and left work in the middle of his work schedule, when her father was sick, was not subjected to the kind of treatment that he was. Candace is in her mid-20s to 30s, and she was never disciplined.

295.    MGUH discriminated against Bermudez, because of his age, when it failed to follow its progressive discipline procedure, and to give him a "memorandum of expectations" and reasonable time to improve whatever behavior or performance it claims he needs to improve. But Defendant provided such "memorandum of expectations" and reasonable time to improve, to Jordan Nemark, who at the time in 2022, when she was fired, was in her mid-20s, to 30s. MGUH's disparate treatment of Bermudez because of his age, is in violation of the DCHRA.

296.    For over 17 years Plaintiff worked for MGUH with dedication and loyalty. During those years, Plaintiff acquired on the job experience and tremendous skills that highly benefited MGUH. Also, during the almost two decades, working for MGUH his salary gradually rose. However, because of his age, and for the benefit of its bottom-line, MGUH instituted a discriminatory and unlawful practice of targeting its older and veteran workers who earn substantially more than new and younger hires, for termination. This, also, amounts to age discrimination, and it is in violation of the DCHRA.

297.    By terminating older workers like Plaintiff, MGUH achieves its bottom-line policy by way of discriminatory termination of older surgical technicians like Bermudez, not on account of their ability to perform, or wrongdoing, but just because they are older.

298.    By terminating Plaintiff, and replacing him with a younger employee, MGUH can use the same or about the same salary it pays Bermudez to pay one and half, or even two young, fresh from school, and inexperienced surgical techs to do his job, to serve, its bottom-line interest, but not so much the interests of the patients they serve, who need, and deserve all the skilled, and experienced nurses, like Bermudez, that they could have, to serve them. This, practice amounts to discrimination on account of age, in violation of the DCHRA.

299.    Because of MGUH's supervisors, and agents' discriminatory actions, Bermudez suffered,

and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional

distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him

to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

300.    Because MGUH, its management and agents, intentionally discriminated against

Bermudez in her employment, on account of her age, MGUH, is liable to Plaintiff for

compensatory and punitive damages.

**COUNT XIV**
**Retaliation Violation of DCHRA**

301.    Plaintiff hereby incorporates by reference the preceding paragraphs.

302.    DCHRA prohibits an employer from retaliating against an employee, because he has

exercised any rights protected under this chapter.

"(a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate
against, or interfere with any person in the exercise or enjoyment of, or on account of
having exercised or enjoyed, or on account of having aided or encouraged any other
person in the exercise or enjoyment of any right granted or protected under this chapter.

(b) It shall be an unlawful discriminatory practice for any person to require,
request, or suggest that a person retaliate against, interfere with, intimidate or
discriminate against a person, because that person has opposed any practice made
unlawful by this chapter, or because that person has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding or hearing authorized under
this chapter.

(c) It shall be an unlawful discriminatory practice for any person to cause or
coerce, or attempt to cause or coerce, directly or indirectly, any person to prevent any
person from complying with the provisions of this chapter." DC Code § 2–1402.61(a),
(b), and (c).

303.    Plaintiff engaged in activities protected by DC Code § 2–1402.61, et seq., when he was

retaliatorily suspended, on 3/29/2024, because during his meeting with Smith and Geide, he

complained to them on 02/12/2024, that he has anxiety going to work, because he felt being

targeted, isolated, that he felt he was working on egg shells, because he was afraid of being

written up and suspended as he was in the fall of 2023; and when he complained about being treated discriminatorily and unfairly, intimidated, and harassed by Geide's maligning hostile statement, which he concocted, that he [Geide] and other staff, needed bullet proof vests, if Plaintiff were to be allowed back at work because he "will shoot the hospital up", which Bermudez found intolerable, and totally unacceptable.

304.    Plaintiff also engaged in activities protected by DC Code § 2–1402.61, et seq., when he was retaliatorily terminated, because he complaint to Smith and the payroll office about him not being paid, for a certain pay period, and four (4) days later, he was terminated by Smith.

305.    MGUH's given reason for terminating Bermudez, is nothing but a pretext and cover up for its true discriminatory reasons for firing Plaintiff. MGUH's actions were intended to harm him, in violation of DC Code § 2–1402.61, et seq.

306.    MGUH retaliated against Bermudez, by its hostile harassment, and intimidating treatment, including but not limited to suspending, and terminating him, after he complained to Smith and Geide, about the unfair, isolated, hostile and intentionally discriminatory way that he has been treated, based on his race or ethnicity, in violation of DC Code § 2–1402.61, et seq.

307.    MGUH and its agent's actions were intentional, with reckless indifference to Plaintiff's rights.

308.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

309.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, due to his protected activities, are in violation of DC Code § 2–1402.61, et seq.

310.    They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

311.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, because of his protected activities, in violation of DC Code § 2–1402.61, et seq., and as such Bermudez, is entitled to compensatory, and punitive damages.

**COUNT XV**
**Violation of DCHRA Harassment Hostile Work Environment**

312.    Plaintiff hereby incorporates by reference the preceding paragraphs.

313.    MGUH engaged in unlawful employment practices in violation of the DCHRA, by subjecting Bermudez, to unwarranted harassment hostile work environment, when he was suffering with to the effects, and symptoms of military service-connected PTSD that he had suffered for over a decade while working for MGUH, when MGUH gave him written warnings; suspensions; referral for fitness for duty based on false, fabricated, defamatory, hostile narrative by Geide, that was intended to hurt Plaintiff's professional character, and employment status; putting Plaintiff on a "liberal leave" (aka paid suspension), but intimidatingly reneging on that promise, which caused Bermudez to go for weeks without any pay, after exhausting his PTO; failing to pay Bermudez during a second suspension, during a certain pay period and further delaying that payment for another three (3) days after Plaintiff complained about not being paid; targeted, singled out, and isolated; when Defendant refused to return Bermudez to work, and "moved the goal post" further for him, after the hospital's OCHD had certified him as fit for duty, and to be returned to work; and when MGUH ultimately intentionally and discriminatorily

terminated him, because they do not want to accommodate him as a disabled employee, with a PTSD disability.

314.    MGUH and its agents, created an intolerable and uncomfortable, harassment hostile work environment, that impacted Bermudez' ability to do his job, in violation of the DCHRA, and MGUH progressive discipline and anti-harassment hostile work environment policy.

315.     MGUH harassed and subjected Plaintiff, to intolerable, unwarranted, and unwanted harassment hostile work environment, and disparate treatment by Smith and Geide, with the tacit support or negligence of MGUH's management officials and agents, that did not intervene, properly investigate, and prevent Smith and Geide from harassing, intimidating, humiliating, and ultimately terminating Plaintiff, for no legitimate reason, but to damage his employment career at MGUH, in violation of the DCHRA.

316.    MGUH, harassed and subjected to harassment, disparate working conditions and a hostile work environment through its management supervisors, and agents, when MGUH's OR manager took adverse actions as listed above at ¶ 313, against Plaintiff for no legitimate reason, in violation of the DCHRA.

317.    MGUH's actions against Bermudez, amounts to harassment and hostility, because it created a hostile work environment that was intolerable, that impacted his ability to do his job and in continuance of that hostility, Plaintiff's employment, was intentionally terminated in violation of the DCHRA.

318.    Plaintiff found MGUH and its agents' actions against him very repugnant and unacceptable. He complained to his superiors several about the discriminatory practices actions that were directed at him in the workplace, that caused a lot of anxiety about going to work, but

MGUH's management officials, paid no attention, or tried to investigate for example, why he was targeted, singled out or isolated.

319.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

320.    MGUH and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, in violation of the DCHRA. As MGUH's actions are in violation of the law and as such Bermudez, is entitled to an award of compensatory, and punitive damages.

**COUNT XVI**
**Failure to Hire on the Basis of Disability, Perceived Disability, and/or**
**the Need to Make a Reasonable Accommodation**
**DCHRA, "§ 2-1401.11, et seq.**

321.    The DCHRA, "§ 2-1401.11, et seq. prohibits an employer to discriminate against or to refuse to hire an applicant for a job, due to that applicant's disability:

> (a)    It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual:

> (1)    By an employer - To fail or refuse to hire, or to discharge, any individual; or otherwise, to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee. DCHRA, "§ 2-1401.11, et seq.

322.    Plaintiff hereby incorporates by reference the preceding paragraphs.

323    At all relevant times, Bermudez had a physical impairment, Post Traumatic Stress Disorder, which substantially limits the major life activities, of working, concentrating, thinking, managing stress, communicating, controlling irritability, eating, sleeping, and also, major bodily functions of emotional regulation, retaining memory, mood regulation, and heightened state of alertness.

324.    Defendant is an employer under DCHRA, "§ 2-1401.11, et seq.

325.    At all relevant times, Bermudez had a disability within the meaning of DCHRA, "§ 2-1401.11, et seq.

326.    Bermudez' Post Traumatic Stress Disorder is not a minor physical impairment.

327.    Bermudez' Post Traumatic Stress Disorder is not a physical impairment with an expected duration of 6 months or less.

328.    At all relevant times, MGUH perceived Bermudez as having a physical impairment.

329.    Hector Bermudez was qualified to perform the essential functions of an Operating Room (OR) Surgical Technician, for which MGUH hired him for, for over 17 years, with or without reasonable accommodations.

330.    On or about August 28, 2024, MGUH engaged in unlawful employment practices in violation of the DCHRA, "§ 2-1401.11, et seq, by failing to rehire Bermudez on the basis of his disability and/or because MGUH regarded him as having a physical impairment and/or because of the need to accommodate Bermudez' disability.

331.    The effect of the practices complained of in ¶ 50 above, has been to deprive Bermudez of equal employment opportunities and otherwise to adversely affect his position or status as an applicant for employment because of his disability.

332.    The unlawful, discriminatory employment practices described above were deliberate and intentional.

333.    The unlawful employment practices described above were done against Bermudez with malice or with reckless indifference to his federally protected rights.

**COUNT XVII**
**Violation of the ADA Disparate Treatment Discrimination**
**42 U.S.C. §. 12101, et seq.**

334.    The ADA prohibits an employer from discriminating against an employee, because he has a disability. 42 U.S.C. §. 12112, et seq.:

> (a)    No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. §. 12112, et seq.

335.    MGUH engaged in intentional unlawful employment practices in violation of 42 U.S.C. §. 12101, et seq., by subjecting Bermudez to discriminatory adverse actions, and by intentionally, and recklessly, terminating him after over seventeen (17) years of dedicated, competent, and outstanding service to MGUH, that was backed by superior skill, which he earned, mastered, and perfected, through practical experience, and a high sense of purpose.

336.    MGUH unlawfully and intentionally terminated Plaintiff, a disabled employee, who suffers from PTSD, based on a house of cards, ridiculous, and vague reason of "inappropriate behavior and comments" that has no legitimate basis, but a mere pretext and cover, especially when the alleged "inappropriate behavior and comments" were clearly triggered by PTSD symptoms, that Bermudez suffers from, and at times, struggles to control.

337.    MGUH also ignored the totality of the circumstances of Bermudez' alleged comments or behavior - the delicate surgeries being performed, with time being of the essence, and his

coworker's failure to understand that, and to act professionally and cooperatively as a team, and also, the actions or decisions of OR director Smith, who seems to forget what her job, and that of the OR team is - to serve the patients and assist the doctors in performing patient surgeries, for safe and successful outcomes for the patients.

338.    Smith and Geide, filled with hatred, bias, and intentional discriminatory animus against Bermudez, terminated Bermudez without a legitimate reason, but because of his disability - PTSD, even though Plaintiff, had at all times been qualified to work as a surgical tech, and have always performed his duties satisfactorily as required of him.

339.    MGUH is a covered entity/employer as defined under 42 U.S.C. §12111.

340.    At all relevant times, Bermudez had a disability within the meaning of Section 12102 (1)(A) of the ADA.

341.    Bermudez' Post Traumatic Stress Disorder is not a minor physical impairment.

342.    Bermudez' Post Traumatic Stress Disorder is not a physical impairment with an expected duration of 6 months or less.

343.    At all relevant times, Defendant perceived Bermudez as having a physical impairment.

344.    Bermudez was qualified to perform the essential functions of an Operating Room (OR) Surgical Technician, for which Defendant hired him for, for over 17 years, with or without reasonable accommodations.

345.    MGUH terminated Bermudez, after over 17 years of loyal, and dedicated service to it, under circumstances that a fair and objective jury will find disparate treatment discrimination based on his disability, because unlike certain of his co-workers who are outside his protect class, MGUH took several unlawful adverse actions (mentioned herein), including, but not limited to giving written warnings, suspending him, and ultimately terminating him in violation of 42 U.S.C. §. 12101, et seq., and its own progressive discipline policy.

346.    At the time of the adverse employment actions, taken against Bermudez, including, but not limited to his termination, suspension, failure to hire, write ups, unwarranted fitness for duty evaluation, and hostile actions of not returning him to work, and not paying him on time, Bermudez was performing his job duties satisfactorily. MGUH never claimed otherwise.

347.    Bermudez, was treated differently and worse than his non-Hispanic employees, who were outside his protected class.

348.    Bermudez is a Hispanic American male, and MGUH and its employees, management supervisors, representatives and agents were aware of this fact, and his race, national origin, sex/gender were motivating factors in MGUH's intentional disparate treatment, of termination, written warnings, suspensions, unwarranted fitness for duty evaluation referral, late payment of his wage, and further delay of the payment, when he complained about the late payment, and other adverse, hostile actions against him.

349.    MGUH, and its agents, engaged in unlawful employment practices in violation of 42 U.S.C. §. 12101, et seq, by subjecting Bermudez to discriminatory hostile treatments, by denying him, his civil rights, and equal terms, benefits and conditions of employment under the law, by unfairly not fully paying him during the period MGUH put him on "liberal leave" (aka paid suspension), and refused to return him to work, after he had been certified fit for duty, and to return to work, by the OCHD, based on his race, national origin, and sex/gender.

350.    MGUH's termination of Bermudez, after over seven teen (17) years of exemplary service to MGUH, was discriminatory, and intentional, to deprive him of equal terms, benefits, and conditions of his employment, that his white, female, male Caucasian doctor and black African American female surgical technician, coworkers received.

351.    Bermudez' coworkers who are white Caucasian Americans, and black African American, who in fact, asked to leave work in the middle of their work schedule - same reasons or any reasons they gave, were treated more favorably, as they were never given a written warning, never suspended, never referred for assessment of fitness for duty, and were not ultimately terminated, and were not subjected to the kind of targeting, isolation, intimidation, humiliation, and outright harassment and hostility that Smith and Geide, in concert, subjected him to, based on his race, national origin, and sex/gender.

352.    MGUH, through its agent's animus-based, discriminatory actions, and treatment against Bermudez, leading to, and his termination, intentionally and unlawfully deprived Plaintiff of his rights and privileges of employment, on the basis of his disability, in violation of 42 U.S.C. §. 12101, et seq.

353.    The unlawful employment practices complained herein were intentional.

354.    MGUH's unlawful employment practices complained of herein, were directed against Bermudez with discriminatory animus, with malice or with reckless indifference to his protected rights under 42 U.S.C. §. 12101, et seq., and MGUH's own progressive discipline policy.

355.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

356.    MGUH's unlawful and discriminatory actions against Bermudez, are based on his disability, in violation of 42 U.S.C. §. 12101, et seq. They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and so, entitles him to an award of compensatory and punitive damages.

357.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her

rights and privileges as their employee, in violation of 42 U.S.C. §. 12101, et seq., and as such

Bermudez, is entitled to compensatory, and punitive damages.

**COUNT XVIII**
**Retaliation Violation of the ADA, 42 U.S.C. §. 12203, et seq.**

358.    The ADA prohibits an employer from retaliating against an employee, because he has

exercised any rights protected under this chapter. 42 U.S.C. §. 12203, et seq. Prohibition against

retaliation and coercion, etc.

>       (a)      No person shall discriminate against any individual because such
> individual has opposed any act or practice made unlawful by this chapter or
> because such individual made a charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing under this chapter.

359.    Plaintiff engaged in activities protected by the ADA, 42 U.S.C. §. 12203, et seq., when he

was retaliatorily suspended, on 3/29/2024, because during his meeting with Smith and Geide, he

complained to them on 02/12/2024, that he has anxiety going to work, because he felt being

targeted, isolated, that he felt he was working on egg shells, because he was afraid of being

written up and suspended as he was in the fall of 2023; and when he complained about being

treated discriminatorily and unfairly, intimidated, and harassed by Geide's maligning hostile

statement, which he concocted, that he [Geide] and other staff, needed bullet proof vests, if

Plaintiff were to be allowed back at work because he "will shoot the hospital up", which

Bermudez found intolerable, and totally unacceptable.

360.    Plaintiff also engaged in activities protected by the ADA, 42 U.S.C. §. 12203, et seq.,

when he was retaliatorily terminated, because he complaint to Smith and the payroll office about

him not being paid, for a certain pay period, and four (4) days later, he was terminated by Smith.

361.    MGUH's given reason for terminating Bermudez, is nothing but a pretext and cover up for its true discriminatory reasons for firing Plaintiff. MGUH's actions were intended to harm him, in violation of the ADA, 42 U.S.C. §. 12203, et seq.

362.    MGUH retaliated against Bermudez, by its hostile harassment, and intimidating treatment, including but not limited to suspending, and terminating him, after he complained to Smith and Geide, about the unfair, isolated, hostile and intentionally discriminatory way that he has been treated, based on his disability, in violation of the ADA, 42 U.S.C. §. 12203, et seq.

363.    MGUH and its agent's actions were intentional, with reckless indifference to Plaintiff's rights.

364.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

365.    MGUH's intentional, and unlawful and discriminatory actions against Bermudez, due to his protected activities, are in violation of the ADA, 42 U.S.C. §. 12203, et seq.

366.    They were intentional, willful, malicious, and were intended to injure Bermudez, and was done with conscious disregard for his civil rights, and thus, entitles him to an award of compensatory and punitive damages.

367.    MGUH and its agents, intentionally, unlawfully, and recklessly deprived Plaintiff of her rights and privileges as their employee, because of his protected activities, in violation of the ADA, 42 U.S.C. §. 12203, et seq, and as such Bermudez, is entitled to compensatory, and punitive damages.

## COUNT XIX
### Harassment Hostile Work Environment Violation of the ADA

368.    Plaintiff hereby incorporates by reference the preceding paragraphs.

369.    MGUH engaged in unlawful employment practices in violation of the ADA, 42 U.S.C. §. 12101, et seq., by subjecting Bermudez, to unwarranted harassment hostile work environment, when he was suffering with to the effects, and symptoms of military service-connected PTSD that he had suffered for over a decade while working for MGUH, when MGUH gave him written warnings; suspensions; referral for fitness for duty based on false, fabricated, defamatory, hostile narrative by Geide, that was intended to hurt Plaintiff's professional character, and employment status; putting Plaintiff on a "liberal leave" (aka paid suspension), but intimidatingly reneging on that promise, which caused Bermudez to go for weeks without any pay, after exhausting his PTO; failing to pay Bermudez during a second suspension, during a certain pay period and further delaying that payment for another three (3) days after Plaintiff complained about not being paid; targeted, singled out, and isolated; when MGUH refused to return Bermudez to work, and "moved the goal post" further for him, after the hospital's OCHD had certified him as fit for duty, and to be returned to work; and when MGUH ultimately intentionally and discriminatorily terminated him, because they do not want to accommodate him as a disabled employee, with a PTSD disability.

370.    MGUH and its agents, created an intolerable and uncomfortable, harassment hostile work environment, that impacted Bermudez' ability to do his job, in violation of the ADA, 42 U.S.C. §. 12101, et seq., and MGUH progressive discipline and anti-harassment hostile work environment policy

371.    MGUH harassed and subjected Plaintiff, to intolerable, unwarranted, and unwanted harassment hostile work environment, and disparate treatment by Smith and Geide, with the tacit support or negligence of MGUH's management officials and agents, that did not intervene,

properly investigate, and prevent Smith and Geide from harassing, intimidating, humiliating, and ultimately terminating Plaintiff, for no legitimate reason, but to damage his employment career at MGUH, in violation of the ADA.

372.    MGUH, harassed and subjected to harassment, disparate working conditions and a hostile work environment through its management supervisors, and agents, when MGUH's OR manager took adverse actions as listed above at ¶ 369, against Plaintiff for no legitimate reason, in violation of the ADA, 42 U.S.C. §. 12101, et seq.

373.    MGUH's actions against Bermudez, amounts to harassment and hostility, because it created a hostile work environment that was intolerable, that impacted his ability to do his job and in continuance of that hostility, Plaintiff's employment, was intentionally terminated in violation of the ADA, 42 U.S.C. §. 12101, et seq.

374.    Plaintiff found MGUH and its agents' actions against him very repugnant and unacceptable. He complained to his superiors several about the discriminatory practices actions that were directed at him in the workplace, that caused a lot of anxiety about going to work, but MGUH's management officials, paid no attention, or tried to investigate for example, why he was targeted, singled out or isolated.

375.    Because of MGUH's supervisors, and agents' actions, Bermudez suffered, and continues to suffer, pain, humiliation, lack of self-confidence, financial injury, emotional distress, loss of sleep, loss of appetite, weight loss, serious depression and anxiety, that led him to attempted self-suicide, as a proximate cause of MGUH and its agents' actions.

376.    MGUH and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, in violation of the ADA, 42 U.S.C. §. 12101, et seq. As MGUH's

actions are in violation of the law and as such Bermudez, is entitled to an award of compensatory, and punitive damages.

## COUNT XX
### Violation of the ADA, Failure to Accommodate Have Interactive Consultation 42 U.S.C. § 12112(b)(5)(A)

377.    Plaintiff hereby incorporates by reference the preceding paragraphs.

378.    On or about 10/26/2023, MGUH engaged in an unlawful employment practice in violation of the Americans with Disability Act as Amended, ("ADA"), 42 U.S.C. § 12112(b)(5)(A), by failing to provide a reasonable accommodation to the known physical limitations of Bermudez, when it failed to accommodate Bermudez, when he requested permission to leave work, because he was ill, having serious mental and emotional symptoms of PTSD.

379.    Instead of MGUH accommodating him, it gave Bermudez a written warning, subjected him to an unwarranted test for fitness for duty, for no justifiable reason; suspended him with pay, but then reneged on paying him for over a month during that "liberal leave" or suspension with pay period. In doing so, instead of accommodating Plaintiff who MGUH knew is disabled, MGUH harassed and further traumatized Bermudez.

380.    The effect of the practice complained of in ¶ 55, above, has been to deprive Bermudez of equal employment opportunities and otherwise to adversely affect his status as an applicant for employment because of his disability.

381.    The unlawful employment practices described above were intentional.

382.    The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of Bermudez.

**COUNT XXI**
**Failure to Hire on the Basis of Disability, Perceived Disability, and/or**
**the Need to Make a Reasonable Accommodation**
**42 U.S.C. §§ 12112(a), (b)(5)(B)**

383.    Plaintiff hereby incorporates by reference the preceding paragraphs.

384.    At all relevant times, Bermudez had a physical impairment, Post Traumatic Stress Disorder, which substantially limits the major life activities, of working, concentrating, thinking, managing stress, communicating, controlling irritability, eating, sleeping, and also, major bodily functions of emotional regulation, retaining memory, mood regulation, and heightened state of alertness.

385.    Defendant is a covered entity/employer as defined under 42 U.S.C. §12111.

386.    At all relevant times, Bermudez had a disability within the meaning of Section 12102 (1)(A) of the ADA.

387.    Bermudez' Post Traumatic Stress Disorder is not a minor physical impairment.

388.    Bermudez' Post Traumatic Stress Disorder is not a physical impairment with an expected duration of 6 months or less.

389.    At all relevant times, Defendant perceived Bermudez as having a physical impairment.

390.    Hector Bermudez was qualified to perform the essential functions of an Operating Room (OR) Surgical Technician, for which Defendant hired him for, for over 17 years, with or without reasonable accommodations.

391.    On or about August 28, 2024, MGUH engaged in unlawful employment practices in violation of the ADA, 42 U.S.C. §§ 12112(a), (b)(5)(B), by failing to rehire Bermudez on the basis of his disability and/or because Defendant regarded him as having a physical impairment and/or because of the need to accommodate Bermudez' disability.

292.   The effect of the practices complained of in ¶ 50 above, has been to deprive Bermudez of equal employment opportunities and otherwise to adversely affect his position or status as an applicant for employment because of his disability.

393.   The unlawful, discriminatory employment practices described above were deliberate and intentional.

394.   The unlawful employment practices described above were done against Bermudez with malice or with reckless indifference to his federally protected rights.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Bermudez prays the Court for the following relief:

(a)    Declaratory judgment in her favor, on all 21 Counts of Claims.

(b)    Award Bermudez Compensatory Damages, Back Pay, Front pay (in lieu of reinstatement), and Pain and suffering, to be decided at trial.

(c)    Award Bermudez Punitive Damages, to be decided at trial

(d)    Award Bermudez Reasonable attorneys' fees and costs.

(e)    Award Bermudez Pre-judgment interest

(f)    Award Ms. Hilado, all out of pocket costs, incurred as a result of Defendant's actions and termination of her, that led to this action.

(g)    Award Ms. Hilado such other, and further relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

PLAINTIFF DEMANDS A TRIAL BY JURY

Dated this 28th day of May, 2025

Respectfully submitted


/s/Charity C. Swift_____

Charity C. Emeronye Swift (DC Bar #198209
Stephen Christopher Swift (DC Bar #428459
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
Email: charity@swift.law.pro
E-mail: steve@swift.law.pro

*Attorney for Plaintiff, Hector Bermudez*